**RED LAKE BAND OF CHIPPEWA INDIANS, et al., Appellants,**

v.

**UNITED STATES of America.**

No. 85–5733.

United States Court of Appeals, District of Columbia Circuit.

Argued May 9, 1986.

Decided Sept. 5, 1986.

Harry R. Sachse, Washington, D.C., for appellants.

Michael J. Ryan, Asst. U.S. Atty., with whom Joseph E. diGenova, U.S. Atty., Royce C. Lamberth, and R. Craig Lawrence, Asst. U.S. Attys., Washington, D.C., were on brief for appellee.

Before EDWARDS and BORK, Circuit Judges, and KOZINSKI,* Circuit Judge, United States Court of Appeals for the Ninth Circuit.

BORK, Circuit Judge:

Some 4500 members of the Chippewa tribe live on the Red Lake Reservation located in northwest Minnesota. The Red Lake Band of Chippewa Indians and three

of its members filed this lawsuit against the United States government, seeking compensation under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671–2680 (1982), for property damage arising out of the events of May 19, 1979. In the early morning of that day, a group of dissident tribal members seized several hostages in protest against actions taken by the Chairman of the Red Lake Tribe, Roger Jourdain. The hostages were eventually freed, but by the time the day ended the dissidents had caused considerable destruction of property on the reservation, including burning Jourdain's house to the ground.

The Red Lake Tribe claims that the damage was attributable to the negligence of federal law enforcement officers, in particular to the negligence of an FBI agent who temporarily took charge of law enforcement efforts at the reservation during the disturbance. They seek damages for the property lost as a result of what they consider to be the inept management of this crisis. On cross-motions for summary judgment, the district court denied plaintiffs' motion and granted that of defendant, finding as a matter of law that the actions taken by the federal officers were reasonable and not negligent. For the reasons set forth below, we vacate the summary judgment in part and remand this case to the district court for trial of the issues involved.

### I.

We begin by describing the events on the day of the uprising. All of the facts set forth below are taken from the Joint Statement of Material Facts as to Which There is No Genuine Issue ("Joint Statement"), to which both parties have agreed. Joint Appendix ("J.A.") at 15a–37a.

In May of 1979, responsibility for law enforcement on the Red Lake Reservation lay with the Bureau of Indian Affairs ("BIA"), which maintained a police force headed by Officer Robert McMullen on the

---

* Sitting by designation pursuant to 28 U.S.C. § 291(a).

reservation. This police force was a participant in the Northwest Minnesota Law Enforcement Task Force, a regional group of law enforcement officers that provided additional manpower for participating local agencies in the event of a crisis. When members of the Task Force were dispatched to a locality, they were placed under the command of the head of the local agency; at Red Lake, that was McMullen.

Robert Erwin, who committed most of the acts alleged to be negligent, was not employed by the BIA. He was the senior resident agent of the Federal Bureau of Investigation in Grand Forks, North Dakota, the FBI office closest to Red Lake. The parties have stipulated that "[t]he FBI's statutory mandate was to investigate federal crimes and not to quell civil disturbances or to protect life and property on Indian reservations." Joint Statement at 2, J.A. at 16a.

The revolt on May 19 was precipitated by the firing of the tribal treasurer, Stephanie Hanson, who had criticized Chairman Jourdain's management of tribal affairs, and more generally by an ongoing dispute over tribal matters between Jourdain and other members. On Friday, May 18, McMullen was warned by a tribal judge that there would be trouble on the weekend as a result of the firing of Stephanie Hanson, and McMullen therefore assigned two additional officers to his command for May 19 and 20.

At approximately 4:45 a.m. on the morning of May 19, a group of approximately five armed men, led by tribal member Harry Hanson, entered the Red Lake Law Enforcement Center ("LEC") and took over the building. There were eight officers on duty at the LEC that morning, and when the Hanson group entered, those officers were shooting pool and playing cards. The Hanson group took as hostages two of the BIA officers, a police dispatcher, and two BIA jailers, locking them in one of their own jail cells. They also took several police weapons for their own use.

Five of the BIA officers were able to avoid being taken hostage. They left the LEC in the midst of the takeover, and two of them went to inform McMullen of what had occurred. McMullen then notified the dispatcher at the Beltrami County Sheriff's Office. He reported the situation and requested assistance, and also asked that the FBI be told about the takeover.

At approximately 6:00 a.m., McMullen ordered several of his men to approach the LEC from the south. As they did so, they saw Hanson and others in his group fire guns into the air. Hanson began to move in the direction of the officers, and there was an exchange of fire. Hanson and the other dissidents ran back to the LEC.

At approximately 7:00 a.m., McMullen and the officers who had approached the LEC retreated to a building referred to as "the Mission," where they established a temporary command post. McMullen spoke at this time to one of the dissidents on his car radio, and was told that the hostages would not be harmed as long as the dissidents were not.

At approximately 9:00 a.m., in response to McMullen's request for assistance, seventeen additional officers arrived at the reservation: Beltrami County Sheriff Tom Tolman and five of his deputies, and Bemidji Police Chief David Simondet and ten of his officers. Tolman and McMullen conferred at the Mission and decided to erect roadblocks at four key intersections in order to contain the disturbance by confining the dissidents to the area surrounding the LEC and keeping other people away.

At approximately 9:00 or 9:30 a.m., shortly after the roadblocks had been established, the dissidents fired upon them. McMullen ordered one of the roadblocks pushed back about 150 yards in order to protect the officers. He did not tighten the perimeter around the LEC because he feared that would result in a gun battle, endangering the lives not only of the officers involved but also of the bystanders who had been gathering (in spite of the roadblocks).

At approximately 9:30 a.m., FBI Agent Erwin went to the town of Red Lake. He

had been dispatched by David Brumble, Special Agent in Charge of the Minneapolis division of the FBI, who had ordered Erwin to the reservation to assess the hostage situation and to take charge of the four other FBI agents who had been sent there. He had not ordered Erwin to take charge of all law enforcement activities on the reservation or to take command of the local officers. Erwin did not have authority over either the BIA officers or the reinforcements from the other local agencies.

At approximately 9:50 a.m., Erwin located FBI Agent Aldridge, Chief Simondet, and Herbert McNeal, the father of one of the dissidents, on the "Back of Town" road south of the Mission. Erwin and McNeal then proceeded to a home about a quarter mile away from the LEC, looking for Stephanie Hanson.

At the time Erwin first arrived at the reservation, between 9:00 and 9:30 a.m., McMullen and Sheriff Tolman were at the Mission. They stayed there until approximately 10:15 a.m., and, shortly before 11:00 a.m., they went to the BIA building to establish a permanent command post. Throughout the morning, they were in contact with the Beltrami County police dispatcher and informed him periodically of their whereabouts. Erwin had been informed by 9:10 a.m., that McMullen and Tolman were at the Mission, but did not travel there to look for them. He made some effort to contact them by radio and telephone, but was unsuccessful. The telephone number he used had been given him by a local officer after his arrival at the reservation. Erwin had been told that this number belonged either to the BIA building or the tribal office building. Erwin could not reach anyone at that phone number, and radio contact was impossible because Tolman's car radio had begun to malfunction. Erwin did not himself go to either the BIA building or the tribal office building, he did not send anyone to those buildings, and he did not contact Tolman's or McMullen's headquarters to obtain further information on their whereabouts.

At approximately 11:00 a.m., Erwin heard reports over Chief Simondet's radio that men at the roadblock were taking more gunfire. He again attempted to contact McMullen and Tolman by radio, but was unsuccessful. He did not try to telephone them, nor did he attempt to contact their headquarters. Erwin then directed Chief Simondet to order all law enforcement personnel to withdraw from their positions and assemble on Highway 89. This order was transmitted to all officers in radio communication with Chief Simondet. The parties stipulated that Erwin:

> ordered the withdrawal of law enforcement personnel primarily for their safety after hearing reports of intensified gunfire and because of the lack of communication with other law enforcement authorities on the scene. He intended by the withdrawal to gather all law enforcement officers together in order to assess their strength and to devise a plan of action.

Joint Statement at 17, J.A. at 31a. The withdrawal order was obeyed.

At approximately noon, after the order to withdraw had been issued, the Hanson group set the LEC on fire with the hostages inside. The police garage, approximately fifty feet away, had been set on fire an hour and a half earlier. The hostages were all rescued by a retired BIA officer.

At approximately 1:15 p.m., McMullen and Tolman arrived at the highway intersection at which Erwin had gathered all the officers. McMullen and Tolman had been informed by the Beltrami sheriff's office that the police had been withdrawn to this location. Erwin, having spoken with the Minneapolis Field Office of the FBI, then announced to the assembled officers "that the FBI role was investigative and the FBI was not to go back on the Reservation as a policing agency. This was approximately two hours after the order to withdraw." Joint Statement at 20, J.A. at 34a.

At approximately 2:00 p.m., the BIA officers and the local officers reentered the reservation and established a headquarters at the BIA building. Two hours later, the

FBI's Minneapolis Field Office received reports that approximately twenty or thirty Indians were shooting guns into the air and possibly making Molotov cocktails, all in the vicinity of the LEC. Some were armed with weapons taken from the LEC. The BIA and local officers decided to leave the reservation and wait for reinforcements from the Northwest Minnesota Law Enforcement Task Force.

They returned between 7:00 and 7:30 p.m., after the reinforcements had arrived. Their strategy was to secure the BIA building and to protect the hospital and the other buildings east of the creek from the violence. They did not attempt to protect the west side of the creek. That part of the reservation had fallen under the control of the Hanson group, which had dispersed throughout the area after the officers at the roadblocks had been withdrawn. During the evening, a number of vehicles and buildings west of the creek were burned, including the tribal office building, a tribal warehouse, and the homes of appellants Roger Jourdain and Francis Brun.

Negotiations between Harry Hanson and federal authorities began the next morning. On May 22, Hanson voluntarily surrendered to federal authorities. Five other individuals whom he identified as having participated in the uprising surrendered as well.

The plaintiffs filed their complaint in December of 1981, seeking damages resulting from "the defendant's employees negligent unilateral withdrawal of law enforcement personnel from the Red Lake Reservation in the middle of an insurrection after law enforcement personnel had contained the disturbances by isolating the five (5) violators in one building." Complaint at 1. (The Complaint also charged the government with negligently delaying the arrest of five of the dissidents, but that claim was dropped after discovery.) The tribe sought damages of $11,500,000, and the three individuals, all members of the tribe whose personal property was among that destroyed, sought damages totaling $573,350.

The government moved to dismiss the action for failure to state a claim upon which relief can be granted, on the ground that the allegedly negligent activities were based upon the performance of a discretionary function and were thus exempt from liability under a statutory exception to the Federal Tort Claims Act, 28 U.S.C. § 2680(a) (1982). Granting plaintiffs' complaint every reasonable factual inference, the district court determined that the discretionary decision provision "may not apply in this case," and denied the motion. *Red Lake Band of Chippewa Indians v. United States*, Civ. Action No. 81–3193, mem. op. at 1 (D.D.C. Jan. 29, 1982).

After discovery, both sides moved for summary judgment. The district court denied the motions without prejudice. *Red Lake Band of Chippewa Indians v. United States*, Civ. Action No. 81–3193, mem. op. (D.D.C. Jan. 31, 1984) ("Order to Supplement the Record"), J.A. at 46a–49a. The court was unable to decide the motions on the record as it stood at the time, and directed the parties to supplement the record "as is necessary for the court, sitting without a jury, to make findings of fact." Order to Supplement the Record at 1, J.A. at 46a. Because there is some dispute on appeal over the procedural implications of the actions taken at this stage by the district court, we reproduce here at some length a portion of its memorandum opinion:

> The present procedural posture of this case is somewhat unusual. Both sides have submitted motions for summary judgment and lengthy statements of the complex facts involved in this case, and both sides have claimed that there are no material facts in dispute. However, both sides have also submitted a "Response" to the other side's version of the facts, in which both sides have questioned the version of the other side. At a hearing held on November 30, 1983, it became apparent to the court that certain facts are in dispute, and upon reflection the court has determined that some of these disputes are material, making summary judgment for either side inappropriate.

In the present procedural posture, the court is not in a position to resolve these disputes by finding facts, and if the court were to accept either side's version and inferences completely, it would have difficulty holding against that side. Further, the court believes that it would benefit if the record were clarified in several areas.

The parties have already engaged in substantial discovery. The depositions of all critical persons have been taken, and affidavits and documentary evidence have been submitted to the court. Because this case, if tried, will be tried without a jury, the court believes it can resolve most factual disputes based on the depositions and other evidence already proffered in support of summary judgment motions, and does not believe it is necessary for the parties to present the oral testimony of more than a few witnesses, if any. Further, because both sides originally contended that there are no material issues of fact in dispute, it may be possible for the parties to stipulate to many facts, thus saving time for all concerned. The court does not intend to advise either side on how to proceed, but encourages the parties to get together to pinpoint areas that are in dispute or need clarification, and to avoid presentation of testimony at trial that can be introduced into evidence through depositions or in another efficient manner. Alternatively, if the parties can successfully agree on one version of *all* material facts, and can so stipulate, the court will again entertain cross-motions for summary judgment.

*Id.* at 1–3, J.A. at 46a–48a. The court then provided the parties with a non-exhaustive list of some of the material issues remaining in dispute and encouraged the parties to supplement the record with an eye towards their resolution.

In response, the parties agreed to and submitted the Joint Statement from which our description of the uprising of May 19 was derived. They renewed their motions for summary judgment, incorporating by reference the supporting memoranda previously filed.

The court denied plaintiffs' motion and granted that of defendant. The court stated at the outset:

The parties originally filed cross-motions for summary judgment in November 1983. On January 30, 1984, this court denied both motions on the ground that there were material facts in dispute. In response, the parties filed a Joint Statement of Material Facts as to Which There is No Genuine Dispute ("Joint Statement") on October 10, 1984, and have agreed that disposition of the issue of defendant's liability may be made on the basis of this statement alone, without the necessity of a trial.

*Red Lake Band of Chippewa Indians v. United States*, Civ. Action No. 81–3193, mem. op. at 2 (D.D.C. Apr. 18, 1985) ("Memorandum Opinion"), J.A. at 3a. The court again rejected the government's claim, renewed now on the basis of the supplemented record, that liability was barred by the "discretionary function" exception. The court went on to hold on the merits, however, that plaintiffs could not sustain their claim of negligence.

The district court began its analysis by explaining the elements of negligence liability under Minnesota law, which governs the merits of this case: "[T]he plaintiff must prove that the defendant acted or failed to act such that a duty owed by defendant to plaintiff was breached and such that the defendant's negligence was the actual and proximate cause of plaintiff's injury." Memorandum Opinion at 5, J.A. at 6a (citing *Marlow v. City of Columbia Heights*, 284 N.W.2d 389, 392 (Minn. 1979)). The court concluded that, by taking charge of the situation at Red Lake, Erwin assumed a duty to the plaintiffs to use reasonable care in the execution of his self-assigned responsibility, and that the standard of conduct to which he must be held is that of the "reasonable FBI agent" in the same circumstances. *Id.* at 6, J.A. at 7a.

Plaintiffs' complaint had identified the act of withdrawing the officers from the reservation as the negligent conduct at issue. In later submissions to the court, they specified four elements of that act, each of which they claimed demonstrated Erwin's negligence independently: the taking of command; the strategic decision to order withdrawal; the failure to contact McMullen and Tolman and coordinate efforts with them prior to ordering withdrawal; and the failure to establish a command post. Each of these separate determinations was cast by plaintiffs as a violation of an FBI policy or practice, a characterization plaintiffs sought to use as evidence that these determinations were negligent. Thus, the decision to take command was said to be in violation of an FBI policy against engaging in peace-keeping on Indian reservations; the decision to order withdrawal was said to be in violation of the practice of containment; the failure to contact McMullen and Tolman was said to be in violation of the practice of coordination; and the failure to establish a command post was said to be in violation of a practice favoring establishment of a command post. The policy against engaging in peace-keeping functions on Indian reservations, we note, is different in kind from the three practices said to have been violated in the latter three claims of negligence. The policy against peace-keeping is a jurisdictional one that determines the scope of an agent's authority while the practices of containment, coordination, and establishment of a command post are simply tactical guidelines.

In addition, the plaintiffs charged that the FBI and the BIA had negligently failed to make adequate plans prior to the uprising of May 19 despite warnings that something might happen, and that this violated the practice of contingency planning. The FBI, plaintiffs argued, ought to have met in advance with the BIA to discuss methods of communication and divisions of responsibility in the event of trouble. (Although the FBI did not engage in peace-keeping, it apparently would assist in certain other activities, such as hostage negotiations.) The BIA, in turn, was charged with negligence for doing no more than posting two additional officers in response to the warning McMullen received from the tribal judge. Plaintiffs believe McMullen should have stationed more men, placed them on alert, and perhaps gone to talk with the Hansons.

The district court found no negligence in the decision to take command in contravention of the FBI policy against engaging in policing activity on Indian reservations. The district court reasoned that because that policy was not "designed to protect persons on Indian reservations from injury due to the negligence of FBI agents," the fact that Erwin's decision to take command was in violation of that policy "does nothing to demonstrate" that the decision was a negligent one. Memorandum Opinion at 7, J.A. at 8a.

The court held that the withdrawal order could not be deemed unreasonable as a strategic matter because (a) the roadblocks had not been very effective, (b) bystanders had gathered and were endangered by the gunfire, and (c) the officers were likewise endangered. The court concluded that it would therefore be unable to find on the basis of the stipulated facts that Erwin had breached his duty of care by issuing the order to withdraw.

In discussing the alleged failure of the FBI and BIA to coordinate their efforts, the court stated that "it does appear from the stipulated facts that Agent Erwin did not make every possible effort to contact BIA officer McMullen and Sheriff Tolman prior to making his decision to order withdrawal." *Id.* The court noted, however, that Erwin had made some efforts to find the other officers, and that, "perhaps more significantly," it was "purely speculative" to conclude that had he located them they would have presented him with information which would have rendered the withdrawal order unnecessary or unreasonable. *Id.* at 8, J.A. at 9a. Therefore, the court concluded, there was no evidence that the failure of coordination caused the injuries suffered by plaintiffs.

The claim that the failure to establish a command post was negligent failed for similar reasons. In addition to suggesting that a grocery store at which two FBI agents had been stationed might qualify as a command post, the court stated that it found no evidence from which it could conclude that, if the grocery store did not so qualify, the absence of a command post was the cause of the property damage.

Finally, the court dealt with the contention that the FBI and the BIA had negligently failed to engage in necessary contingency planning. Both offices had received indications that there might be trouble. The court found that the stationing of the additional officers by McMullen was a reasonable and sufficient precautionary measure, given the scant information McMullen had at the time. The court did not address the allegation that the FBI had negligently failed to consult in advance with the BIA. The district court therefore rejected the last allegation of negligent behavior and granted summary judgment to the defendant.

## II.

■ We begin with the government's claim that each of the decisions alleged to be negligent was a performance by a government official of a "discretionary function," and therefore immune from liability. This question is jurisdictional. The Federal Tort Claims Act constitutes a limited waiver of sovereign immunity, and immunity was expressly retained with respect to those official acts

based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.

28 U.S.C. § 2680(a) (1982). Accordingly, even the negligent performance of a discretionary function does not subject the government to liability under the Federal Tort Claims Act.

The district court held that the discretionary function exception did not apply to the order Erwin gave to withdraw. The court recognized that Erwin was required to exercise some degree of judgment and discretion, but noted that the fact that an exercise of judgment is involved does not by itself place a governmental activity within the bounds of the exception. The court stated:

Instead, "the exception exempts the United States from liability only where 'the question is not negligence but social wisdom, not due care but political practicability, not reasonableness but economic expediency.'" Sami v. United States, 617 F.2d 755, 766–67 (D.C.Cir.1979). Rather than being involved in a decision of "social, political, or economic" policy, see id., Agent Erwin was engaged in directing the actions of other government agents in the handling of a particular situation. See Downs [v. United States, 522 F.2d 990, 997 (6th Cir.1975)]. His decision to ignore established FBI policy not to engage in policing activity on Indian reservations was not part of the formulation of a new government policy, but an operational decision regarding what steps would best protect the lives of the persons involved in the particular situation confronting him.

Memorandum Opinion at 4, J.A. at 5a. We agree that the withdrawal order was not an exercise of a discretionary duty, but our reasons differ in some ways from those set forth by the district court.

Our discussion focuses on three cases: Dalehite v. United States, 346 U.S. 15, 73 S.Ct. 956, 97 L.Ed. 1427 (1953); Sami v. United States, 617 F.2d 755 (D.C.Cir.1979); and United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines), 467 U.S. 797, 104 S.Ct. 2755, 81 L.Ed.2d 660 (1984). Dalehite and Varig are the two leading Supreme Court opinions construing the discretionary function exception; Sami is the circuit precedent upon which the district court most heavily relied.

Dalehite was an action for damages against the United States arising out of an explosion of fertilizer that had been produc-

ed under the direction and according to the specifications of the United States government. The government raised the discretionary function exception as a defense, and the decision that followed was the first detailed examination of the meaning of that exception by the Supreme Court. The Court defined the discretion immunized by the exception as "the discretion of the executive or the administrator to act according to one's judgment of the best course." 346 U.S. at 34, 73 S.Ct. 967. The Court held that the discretionary function exception protected not only the initiation of discretionary activities but also the decisions made about how to implement those activities, and that it "necessarily follows that acts of subordinates in carrying out the operations of government in accordance with official directions cannot be actionable." *Id.* at 36, 73 S.Ct. at 968. The acts alleged to have been negligent—improper bagging, labeling and coating—were all held to be shielded from liability as acts "performed under the direction of a plan developed at a high level under a direct delegation of plan-making authority from the apex of the Executive Department." *Id.* at 40, 73 S.Ct. at 970.

Lower courts developed a variety of analytical frameworks for applying the "discretionary function" exemption in light of *Dalehite.* One of the tests that evolved focused on distinguishing between "planning decisions" (which were immune) and "operational decisions" (which were not).[1] *See, e.g., United States v. State of Washington,* 351 F.2d 913, 916 (9th Cir.1965); *Mahler v. United States,* 306 F.2d 713, 723–24 (3d Cir.), *cert. denied,* 371 U.S. 923, 83 S.Ct. 290, 9 L.Ed.2d 231 (1962); *Fair v. United States,* 234 F.2d 288, 293 (5th Cir. 1956). Other courts, finding these analytical labels conclusory and not particularly useful, *e.g., Gray v. Bell,* 712 F.2d 490, 507 (D.C.Cir.1983), focused more generally on an analysis of the nature of the discretion required by the act from which

the claim arose, to determine if it was the sort of discretion the exception was meant to immunize. *See, e.g., Payton v. United States,* 636 F.2d 132, 138 (5th Cir.1981).

*Sami* followed that second line of inquiry. In *Sami,* the plaintiff claimed that he had been wrongfully detained by German officials as a result of a communication sent by the United States government. The government argued that the challenged action fell within the exemption. Although we noted that prior circuit decisions had adopted the planning/operational dichotomy, *e.g., Eastern Air Lines, Inc. v. Union Trust Co.,* 221 F.2d 62 (D.C.Cir.), *aff'd mem. sub nom. United States v. Union Trust Co.,* 350 U.S. 907, 76 S.Ct. 192, 100 L.Ed. 796 (1955), the emphasis of our analysis in *Sami* was primarily on whether the acts for which liability was claimed "were essentially 'political,' 'social' or 'economic' or necessarily involved any policy-making function at all." 617 F.2d at 767. We found the exception inapplicable on the record before us in that case.

*Varig* was issued after *Sami,* and endorsed a similar approach. The case was a tort suit by the victims of an airplane accident who alleged that the Federal Aviation Administration had been negligent in certifying the aircraft in which they flew. The government argued that the act of certifying was discretionary within the meaning of the Federal Tort Claims Act, and the Court agreed.

The Court explained that one of the underlying rationales for the exception was to prevent "judicial intervention in policymaking" in the guise of adjudication of tort disputes, 467 U.S. at 820, 104 S.Ct. at 2768, and therefore, the Court concluded, analyses of the exception which focused upon the *level* of government decisionmaking involved were misguided. Rather, it is "the nature of the conduct, rather than the status of the actor, that governs whether the discretionary function exception applies in

---

1. This test was drawn from a passage in *Dalehite* in which the Court explained that the decisions "held culpable were all responsibly made at a planning rather than operational level and

involved considerations more or less important to the practicability of the Government's fertilizer program." *Dalehite,* 346 U.S. at 42, 73 S.Ct. at 971.

a given case." *Id.* at 813, 104 S.Ct. at 2765. The question whether the negligent actions of a government official may have rendered the government liable does not depend upon whether the actor functioned at an operational or a planning level, but instead on whether the decisions he made were "grounded in social, economic, and political policy." *Id.* at 814, 104 S.Ct. at 2765.

The Court in *Varig* found the act of certification to be protected by the exception. The Secretary of Transportation had been directed by statute to promulgate regulations governing the inspection of aircraft, and the decisions concerning the manner in which the regulations would be enforced were, therefore, themselves discretionary because such decisions "directly affect the feasibility and practicality" of the program, and "require the agency to establish priorities for the accomplishment of its policy objectives by balancing the objectives sought to be obtained against such practical considerations as staffing and funding." 467 U.S. at 820, 104 S.Ct. at 2768. The Court went on to conclude that, as a result, "the acts of FAA employees in executing the [inspection program] in accordance with agency directives are protected by the discretionary function exception as well," since the regulations empowered those employees to "make policy judgments regarding the degree of confidence that might reasonably be placed in a given manufacturer, the need to maximize compliance with FAA regulations, and the efficient allocation of agency resources." *Id.*

■ Some clear principles emerge from *Varig.* The discretionary function exception shields the government from liability for those decisions which involve a measure of policy judgment, and immunizes as well the execution of such decisions in specific instances by subordinates, even those at the operational level, if they must

exercise such judgment too. Government decisions which do not involve discretion to make or implement policy, in contrast, may give rise to a tort claim, even if those decisions require the exercise of other forms of discretion.

■ A corollary to these principles, and our basis for affirming the district court's holding on this issue, is that a decision cannot be shielded from liability if the decisionmaker is acting without actual authority. A government official has no discretion to violate the binding laws, regulations, or policies that define the extent of his official powers. An employee of the government acting beyond his authority is not exercising the sort of discretion the discretionary function exception was enacted to protect. This proposition is implied in *Varig* and *Dalehite,* [2] and has been uniformly followed. *See Hatahley v. United States,* 351 U.S. 173, 181, 76 S.Ct. 745, 751, 100 L.Ed. 1065 (1956); *Jayvee Brand, Inc. v. United States,* 721 F.2d 385, 389 (D.C. Cir.1983); *Birnbaum v. United States,* 588 F.2d 319, 329 (2d Cir.1978); *Griffin v. United States,* 500 F.2d 1059, 1068–69 (3d Cir.1974). We find it controlling here.

■ We thus need not and do not decide whether on-the-spot tactical decisions made by law enforcement personnel are "operational decisions" or "planning decisions," or whether and in what circumstances such decisions constitute the exercise of a discretionary function. The parties have stipulated that

> FBI Agent Erwin did not have authority over the BIA or local law enforcement officers on the scene at the Red Lake Indian Reservation.

and that

> [t]he FBI's statutory mandate was to investigate federal crimes and not to quell civil disturbances or to protect life and property on Indian reservations.

---

**2.** *See, e.g., Varig,* 467 U.S. at 820, 104 S.Ct. at 2768 ("the acts of FAA employees in executing the 'spot-check' program *in accordance with agency directives* are protected" (emphasis added)); *Dalehite,* 346 U.S. at 36, 73 S.Ct. at 968 ("acts of subordinates in carrying out the opera-

tions of government *in accordance with official directions* cannot be actionable" (emphasis added)); *id.* at 36–37 n. 32, 73 S.Ct. at 968 n. 32 ("negligence in policies or plans *for authorized governmental activities* cannot support damage suits" (emphasis added)).

Joint Statement at 2, 13, J.A. at 16a, 27a. Since Erwin did not have authority to take charge of the non-FBI law enforcement personnel on the reservation, and since he did so in a departure from an established FBI policy against engaging in policing activity on reservations, his actions in taking charge and ordering the withdrawal are not shielded from liability under the discretionary function exception. The Red Lake Band therefore states a claim for relief not only with respect to any negligence that might have been committed in the specific act of taking charge, but in the orders issued and the procedures followed after Erwin had assumed command.[3] All decisions made by Erwin pursuant to his assumption of that leadership role were outside the scope of his authority and therefore outside the scope of the discretionary function exception.[4] Whether they were in fact negligent is, of course, a wholly separate question.

The government argues that Erwin's order to withdraw was an exercise of a discretionary duty because it reflected two policy considerations: the policy in favor of protecting human life, and the policy against the FBI assuming a peace-keeping role on Indian reservations. The latter policy might justify and immunize an order to withdraw directed solely at other FBI agents, but that is not what happened here. Erwin withdrew *all* law enforcement personnel from the reservation in order to develop a plan of action. That decision cannot reasonably be characterized as the execution of an FBI policy of non-interference. The policy in favor of protecting life is likewise insufficient to bring Erwin's actions within the ambit of the discretionary function exception, because an individual agent's freedom to act as he believes will best protect human life is circumscribed by the rules that limit the bounds of his authority.[5]

3. We emphasize that the mere allegation that a government employee has ignored an agency practice does not by itself automatically take an activity outside of the discretionary function exception. Central to our decision today is that Agent Erwin had no authority to issue orders to the non-FBI law enforcement officers. If, in contrast, he had possessed such authority, and if we had determined that his tactical decisions were performances of a discretionary function, then plaintiffs would not be able to press their claim simply by stating that those decisions violated practices like containment, coordination, and establishment of a command post. Those are tactical guidelines and do not address the agent's authority.

4. Under the Federal Tort Claims Act, the United States is liable only when the tort is committed by a government employee "acting within the scope of his office or employment." 28 U.S.C. § 1346(b) (1982). Although Erwin had no authority to take command, he was nevertheless acting within the scope of his office when he did so. "There is an area, albeit a narrow one, in which a government agent, like a private agent, can act beyond his actual authority and yet within the scope of his employment." *Hatahley v. United States*, 351 U.S. 173, 181, 76 S.Ct. 745, 751, 100 L.Ed. 1065 (1956). According to Minnesota law, a finding that an employee's act of negligence was within his scope of employment will be made when it is shown that his conduct was "to some degree, in furtherance of the interests of his employer." Additionally, courts will consider whether "the conduct is of the kind

that the employee is authorized to perform and whether the act occurs substantially within authorized time and space restrictions." *Edgewater Motels, Inc. v. Gatzke*, 277 N.W.2d 11, 15 (Minn.1979). Erwin was engaged in law enforcement, and he had been sent to the reservation—albeit only in order to assess the situation and direct the other FBI agents—by his superior officer. He was, quite plainly, acting within the scope of his employment.

5. Despite its concession in the Joint Statement that Erwin had no authority to issue orders to the BIA and local law enforcement personnel, the government suggests the contrary proposition in its brief, citing the following exchange from the deposition of Erwin's superior, David Brumble:

Q: What reaction, if any, did you have [to the order to withdraw]?
A: I thought it was an outstanding and very courageous decision to make because he did so, I am sure, in the face of severe criticism from local law enforcement.
Q: Was he authorized to make that decision?
A: Sure, he was.

Deposition of David Brumble at 66. A few pages later, however, on re-direct, Brumble gave the following responses to questions from plaintiffs' counsel:

Q: This deals with Mr. Erwin's report to you ordering off the law enforcement officials from the reservation. You said that he was authorized to make that decision. Was his authority over the FBI personnel?

■ We believe, however, that while Erwin's conduct in taking command and ordering the withdrawal without contacting McMullen and without establishing a command post did not constitute the performance of a discretionary duty, two of appellants' other allegations, which the district court did not address in its discussion of discretionary functions, do fall within the exception.

First, one of the acts characterized as negligent by appellants was the decision by Erwin, after the officers had been withdrawn and assembled, to decline to reestablish an FBI presence on the reservation. The appellants regard this as an abandonment, and a negligent one, but even assuming the validity of that characterization, the decision cannot be a predicate for tort liability. Erwin was following instructions relayed to him by his superiors and issued pursuant to the policy against FBI engagement in peace-keeping functions on Indian reservations. Although perhaps late in coming, it was clearly the sort of policy decision protected by the discretionary function exception.

We believe the same is true of the alleged failure by the BIA and the FBI to make contingency plans in advance of the uprising. Law enforcement personnel receive warnings, rumors and threats all the time. They are constantly required to assess the reliability of the information they receive, and to allocate scarce personnel resources accordingly. In the same way that the determinations made by the BIA of how large a police force to station on each reservation are undoubtedly policy matters immune from tort suits, so too are the deployment decisions made by individual commanders. *Cf. Monarch Insurance Co. of Ohio v. District of Columbia*, 353 F.Supp. 1249 (D.D.C.1973), *aff'd*, 497 F.2d 684 (D.C.Cir.), *cert. denied*, 419 U.S. 1021, 95 S.Ct. 497, 42 L.Ed.2d 295 (1974) (planning and execution of riot control program a discretionary function free from liability).

If the act of certification at issue in *Varig* was discretionary because it required the employees to make policy judgments with regard to the degree of confidence to be placed in various manufacturers and the efficient allocation of agency resources, 467 U.S. at 820, 104 S.Ct. at 2768, then the decision challenged here—which involved estimating the degree of confidence to be placed in a vague warning and assigning personnel accordingly—is certainly discretionary as well. Therefore, in this case, we do not believe that the precautionary measures taken by law enforcement officers in response to rumors of impending trouble could, even if negligent, serve as the basis of a claim under the Federal Tort Claims Act.

In sum, we hold that the district court was correct in concluding that Erwin's decision to take command and his execution of that command were not exempted from liability as the performance of a discretionary duty. The decision to abandon that command, however, and the decisions on the extent of contingency planning made by the BIA do fall into that category and consequently the allegations that those determinations were negligently made or executed must be dismissed.

### III.

Before proceeding to the substance of the district court's ruling on the merits, we need to resolve a dispute between the parties about the procedural posture in which the case was decided, and consequently about the appropriate standard of review. Appellants characterize the decision below as a ruling on motions for summary judgment and argue therefore that the district court, and this court on appeal, are required to read the record in the light most favorable to the party opposing the motion, draw inferences accordingly, and grant or affirm summary judgment only if there is no genuine issue as to any material fact. *See United States v. Diebold*, 369 U.S. 654,

A: Solely.
Q: Solely? He did not have authority over any other law enforcement officials?

A: No.
*Id.* at 70.

655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962). The United States, in contrast, asserts that we may not set aside the district court's findings of fact or the inferences it drew from the record unless we find them to be clearly erroneous. It cites in support of that argument *Case v. Morrisette,* 475 F.2d 1300 (D.C.Cir.1973). In *Morrisette,* we reviewed a judgment that had been entered after the case had been tried upon the facts, *id.* at 1305 & n. 13, and the clear implication of the government's argument is that the case before us was submitted on the stipulated facts for a decision on the merits. Otherwise, the "clearly erroneous" standard could not be said to apply.

While the record of the proceedings below is not free of ambiguity, we are persuaded that appellant's characterization is the correct one. In the excerpt from the Order to Supplement the Record we quoted earlier, *see supra* pp. 1191–92, the court left open the question of what procedures would be followed once the record was supplemented. In that memorandum the court urged the parties to supplement the record in such a way as to "avoid presentation of testimony at trial that can be introduced into evidence through depositions or in another efficient manner," and then stated:

> Alternatively, if the parties can successfully agree on one version of *all* material facts, and can so stipulate, the court will again entertain cross-motions for summary judgment.

Order to Supplement the Record at 2–3, J.A. at 47a–48a (emphasis in original). Upon filing the Joint Statement, both parties renewed their motions for summary judgment and incorporated by reference the memoranda they had submitted in support of summary judgment at an earlier stage of the proceedings. Those memoranda presented arguments that had been crafted to address the legal standards governing the disposition of motions for summary judgment, not those governing the resolution of the merits on the basis of factual inferences drawn from a stipulated set of facts. Although the district court stated in its final opinion that the parties "agreed that disposition of the issue of defendant's liability may be made on the basis of [the Joint] [S]tatement alone, without the necessity of a trial," Memorandum Opinion at 2, J.A. at 3a, appellants deny making any such agreement, and the form of the motions and supporting memoranda filed by *both* parties suggests that they did not believe they had agreed to anything more than seeking a ruling on their motions for summary judgment.

Moreover, the order issued by the district court granted "defendant's motion for summary judgment," Order of Apr. 18, 1985, J.A. at 14a, and the accompanying Memorandum Opinion stated that the court was "judging the joint statement of material facts in the light most favorable to plaintiffs." Memorandum Opinion at 12, J.A. at 13a. We agree, therefore, with appellants' characterization of the proceedings below, and review the decision by determining not simply whether the findings of fact and inferences drawn were clearly erroneous, but rather whether the district court properly concluded that "no meaningful issue of material facts remains." *Id.*

■ Under that standard, we believe the grant of summary judgment must be vacated in part. As we have stated in the past, the court's function in ruling on a motion for summary judgment.

> is not to try disputed issues of fact, but only to ascertain whether such an issue is present, and any doubt on that score is to be resolved against the movant. Since it is he who bears the onus of establishing his entitlement to summary judgment, his opponent enjoys the benefit of all favorable inferences from the evidence proffered....

*Abraham v. Graphic Arts International Union,* 660 F.2d 811, 814 (D.C.Cir.1981) (footnotes omitted). On several disputed points in this case from which inferences could be drawn either way, however, the district court drew the inferences most favorable to the defendant and then granted it summary judgment on the basis of those inferences.

**1200**

For example, the district court rejected the claim that Erwin's decision to issue the withdrawal order without coordinating his efforts with McMullen and Tolman was negligent primarily because the court considered it "purely speculative" to conclude that had they met and shared information, the withdrawal order would not have been issued. However, the parties have stipulated that McMullen knew, and Erwin did not know,

> the number and location of the officers at the roadblocks and in general, the equipment available to them, the equipment available to the militants, and specific information on the identities of the militants and the hostages.

Joint Statement at 18, J.A. at 32a. In addition, McMullen was aware, as Erwin was not, that reinforcements were going to arrive from the Northwest Minnesota Law Enforcement Task Force, and McMullen's plan to contain the crisis through roadblocks was premised in part on that fact. Joint Statement at 11, J.A. at 25a. This record does not require the conclusion that Erwin was negligent in failing to coordinate his efforts with the others. It does, however, make impossible reliance on the contrary inference in ruling on defendant's motion for summary judgment. It also renders impermissible in ruling on that motion the drawing of the inference that the order to withdraw was itself reasonable, since one of the reasons that order is alleged to have been negligent was that it was issued with insufficient knowledge and inadequate coordination with the other officers.

The rejection of the claim that the failure to establish a command post was negligent is unsustainable for similar reasons. The district court rejected that claim on two grounds. First, the court noted that it was "unclear" whether the grocery store at which two FBI agents had been stationed qualified as a command post. Memorandum Opinion at 9, J.A. at 10a. Second, the court found no evidence from which it could conclude that the absence of a command post had caused the property damage. We think the issue of whether a command post had been established, if "unclear," ought to have been resolved in plaintiffs' favor for purposes of defendant's summary judgment motion. Additionally, we think it not implausible to suggest that establishment of a command post might have made coordination with the other officers more likely. At the very least, there was no basis for the court to assume that the absence of a command post bore no causal relationship to the damage, once the parties had stipulated that joint command posts are generally established when there are several agencies at work on the same crisis to serve as "the communications and information center." Joint Statement at 5, J.A. at 19a.

Finally, the court ruled that the decision by Erwin to take command could not itself be viewed as negligent because, while it was in violation of FBI policy, the FBI policy it ignored had not been established in order to protect persons on Indian reservations. We disagree with this ruling as well. The issue of Erwin's negligence in taking command does not turn on the *purpose* of the policy vesting command elsewhere. Appellants' claim does not seem to be based solely on the theory that negligence arises only from a violation of official policy. Thus, had there been no FBI policy, appellants would still have their argument that taking command in these circumstances was a negligent act. Drawing all inferences from the facts in appellants' favor, as must be done in considering the government's motion for summary judgment, the court could draw the following three inferences. Erwin was aware that the BIA was responsible for law enforcement on the reservation. He saw the roadblocks, and therefore must have known that a strategy of some sort had been conceived and was being executed. He had no reason to believe that the officers at the roadblocks were cut off from communication with the officer who was directing the operation. In order then to hold that Erwin's decision to take command, alter the pre-existing strategy, and countermand the earlier instructions was negligent, a court need not find that the *purpose* of assigning responsibility to the BIA and not the FBI

was to protect persons on reservations. The conclusion of negligence could be drawn if the court simply found that a reasonable FBI agent in similar circumstances would not have so acted. We, of course, express no opinion on what conclusion should be reached.

While we therefore vacate the grant of summary judgment to the defendant, we do not conclude, as appellants urge us to, that the district court erred when it denied their motion for summary judgment. Many of the inferences drawn in the court's Memorandum Opinion that were impermissible when drawn in the defendant's favor in granting its motion for summary judgment would have been entirely permissible for the purpose of denying plaintiffs' motion. We therefore affirm the denial of plaintiffs' motion for summary judgment, affirm the granting of defendant's motion in part, and remand this case for trial of the remaining issues on the merits. The allegations of negligence at issue will be those that relate to the actions we have held to be outside the scope of the discretionary function exception.

*It is so ordered.*