**JOWETT, INCORPORATED,**
Plaintiff–Appellant,

v.

**UNITED STATES, Defendant–Appellee.**

No. 00–5021.

United States Court of Appeals,
Federal Circuit.

Dec. 13, 2000.

Philip C. Jones, Braude & Margulies, of Washington, DC, argued for plaintiff-appellant.

Harold D. Lester, Jr., Assistant Director, Commercial Litigation Branch, Civil Division, Department of Justice, of Washington, DC, argued for defendant-

appellee. With him on the brief were David W. Ogden, Assistant Attorney General; and David M. Cohen, Director. Of counsel on the brief was Richard P. White, Attorney, Office of Counsel, U.S. Army Corps of Engineers, of Baltimore, MD.

Before CLEVENGER, Circuit Judge, FRIEDMAN, Senior Circuit Judge, and DYK, Circuit Judge.

DYK, Circuit Judge.

This case involves a claim for an equitable adjustment to an Army Corps of Engineers construction contract. Appellant Jowett, Incorporated ("Jowett") seeks review of a decision by the United States Court of Federal Claims granting the government's motion for summary judgment and denying Jowett's cross-motion for summary judgment. *Jowett, Inc. v. United States,* No. 98–590C (Fed.Cl. Oct. 27, 1999). We affirm.

## BACKGROUND

On June 24, 1996, the United States Army Corps of Engineers awarded a contract to Jowett to construct a three-story air-conditioned office building at Fort Belvoir, Virginia. Each floor of the building was twenty-two feet high and contained thirty-six inch raised flooring. The contract called for the construction of occupied space directly above the raised flooring and the construction of a suspended ceiling above the occupied space.

The contract also required Jowett to construct ceiling spaces between the suspended ceiling and the raised floor or roof deck above. The ceiling spaces would house wiring for the building's electrical systems, as well as all of the cold-air supply ducts for the building's air conditioning system. The contract also provided that the ceiling spaces would serve as return air plenums, removing air from the air-conditioned rooms and returning it to the air handling units. Jowett constructed and installed the ductwork for the building, but subcontracted the insulation work

required by the contract to Southern Insulation, Inc. ("Southern").

At issue in this case are two sections of the contract specifications relating to the insulation of the building. Section 3.3.1, entitled "Insulation and Vapor Barrier for Cold Air Duct," required, in pertinent part, that "[t]he following shall be insulated: a. Supply ducts[;] b. Return air ducts[;] ... d. Plenums...." Section 3.3, entitled "Duct Insulation Installation," provided, in pertinent part, that:

> Duct installation shall be omitted on the following:
>
> .        .        .        .        .
>
> f. Return ducts in ceiling spaces. Ceiling spaces shall be defined as those spaces between the ceiling and bottom of floor deck or roof deck inside the airconditioned space insulated envelope.
>
> .        .        .        .        .
>
> j. Ceilings which form plenums....

In performing the insulation work, Southern did not insulate ceilings which formed plenums, and also did not insulate the cold-air supply ducts inside the ceiling spaces.

On August 27, 1997, the Army Corps of Engineers met with Jowett to discuss the progress of the construction. At the meeting, Jowett asked whether the contract required the insulation of cold-air supply ducts in the ceiling spaces. On September 3, 1997, the Administrative Contracting Officer determined that the contract required such insulation and directed Jowett to proceed accordingly. Jowett, through its subcontractor, Southern, insulated the cold-air supply ducts in the ceiling spaces under protest.

On January 16, 1998, Jowett submitted a claim to the Contracting Officer, seeking $83,727 in additional expenses incurred by Jowett and Southern in insulating the cold-air supply ducts. Jowett contended that the instruction by the Army Corps of Engineers to insulate the cold-air supply ducts constituted a change in the contract, entitling Jowett to an equitable adjustment

pursuant to the "Changes" clause of the contract.

On May 28, 1998, the Contracting Officer denied the claim. She stated that "[t]he controlling provision [of the contract] is Paragraph 3.3.1 which specifies that . . . insulation and vapor barrier shall be applied to cold-air supply ducts." The Contracting Officer rejected Jowett's interpretation of the contract, noting that "[p]aragraph 3.3j excludes insulation from *ceilings* which form plenums but, by its terms, not from the *cold-air ducts* placed within those ceilings." (Emphasis in original). On July 20, 1998, Jowett commenced a timely action in the Court of Federal Claims for an equitable adjustment to the contract in the amount of $83,727, as well as attorneys' fees and interest.

On April 27, 1999, the government moved for summary judgment, arguing that the plain language of the contract unambiguously required Jowett to insulate the cold-air supply ducts. The government stated that "paragraph 3.3.1 . . . leaves no doubt that the cold-air supply ducts are required to be insulated." The government also contended that paragraph 3.3 of the specifications did not exempt the cold-air supply ducts inside the ceiling spaces from the insulation requirement. The government argued that the exclusion in paragraph 3.3j for "ceilings which form plenums" applied only to ceilings, and not to supply ducts within the ceilings. The government further noted that the paragraph 3.3f was limited specifically to "return ducts in ceiling spaces." The government contended that had the contract drafters intended to exempt the supply ducts as well as the return ducts from requiring insulation, they would have done so.[1]

On June 7, 1999, Jowett filed a cross-motion for summary judgment, arguing that the contract unambiguously exempted the cold-air supply ducts inside the ceiling plenums from the insulation requirement.

Jowett further contended that the government's interpretation of paragraph 3.3j of the specifications—that it applied only to those ceilings which form plenums—was not reasonable.

In support of its motion, Jowett submitted affidavits from executives at four construction firms—Southern, Jowett, The Poole and Kent Corporation, and Mid-Atlantic Insulation, Inc.—disagreeing with the government's interpretation of paragraph 3.3j. The latter two affidavits also attested that it was not "standard practice in the greater Baltimore/Washington area" to insulate supply ducts in ceilings. All of the affidavits attested that there was a well-established practice of not applying duct insulation to ceilings. Each of the affidavits was executed in May 1999, nearly one year after the commencement of the action and nearly three years after the date of the contract award.

On October 27, 1999, the Court of Federal Claims granted the government's motion for summary judgment and denied Jowett's cross-motion, finding that the "plain language of the contract unambiguously requires the insulation of cold air supply ducts located in the ceiling spaces." *Jowett, Inc. v. United States,* No. 98–590C, slip op. at 8 (Fed.Cl. Oct. 27, 1999).

The court also declined to accord any weight to the affidavits provided by Jowett regarding alleged industry practice. The court noted that even assuming the affidavits provided by Jowett correctly stated the industry practice, such practice "cannot be used to vary or contradict the plain language of the contract." *Id.* at 8 n. 10. Following the court's grant of the government's motion for summary judgment, Jowett timely filed this appeal.

## DISCUSSION

### I

We have jurisdiction over this appeal pursuant to 28 U.S.C. § 1295(a)(3). We

---

1. Paragraph 3.3f of the contract exempts "return ducts in ceiling spaces" from the duct insulation requirement, but the record does not indicate whether such ducts were installed in the office building.

review *de novo* the grant of summary judgment by the Court of Federal Claims, as well as its interpretation of the contract. *Barseback Kraft AB v. United States*, 121 F.3d 1475, 1479 (Fed.Cir.1997).

In interpreting a contract, "[w]e begin with the plain language." *McAbee Constr., Inc. v. United States*, 97 F.3d 1431, 1435 (Fed.Cir.1996). "We give the words of the agreement their ordinary meaning unless the parties mutually intended and agreed to an alternative meaning." *Harris v. Dep't of Veterans Affairs*, 142 F.3d 1463, 1467 (Fed.Cir.1998). In addition, "[w]e must interpret the contract in a manner that gives meaning to all of its provisions and makes sense." *McAbee*, 97 F.3d at 1435. In interpreting a contract, a court may accept evidence of trade practice and custom. *Metric Constructors, Inc. v. Nat'l Aeronautics & Space Admin.*, 169 F.3d 747, 752 (Fed.Cir.1999). However, "a court should accept evidence of trade practice only where a party makes a showing that it relied reasonably on a competing interpretation of the words when it entered into the contract." *Id.* at 752.

## II

Before this court, Jowett argues, as it did before the Court of Federal Claims, that its interpretation of the contract specifications—namely, that the contract did not require insulation of the cold-air supply ducts in the ceiling spaces—is the only reasonable interpretation. Jowett further argues that if we find that the contract specifications are ambiguous, the ambiguity is latent and should be construed against the government.[2]

On its face the language of the contract is quite clear: under paragraph 3.3.1, Jowett was obligated to insulate all "supply ducts; return air ducts [and] ... plenums." However, paragraph 3.3 excused Jowett from insulating "[r]eturn ducts in ceilings spaces ... [and][c]eilings which form plenums." It is not disputed that supply ducts, return ducts, ceilings, and plenums are apparently well-understood terms in the construction industry, and have the meaning ascribed to them by the government.

Nonetheless, Jowett argues that, even if there is no ambiguity in the contract's language on its face, we should resort to trade practice to interpret its terms, pointing to this court's decision in *Metric Constructors, Inc. v. National Aeronautics & Space Administration*, 169 F.3d 747 (Fed.Cir.1999). Jowett reads *Metric* to support the following proposition: when the language of the contract does not reflect industry practice, the contract is ambiguous and consequently the evidence of industry practice is admissible to aid in the interpretation of the contract. This view, in essence, enables industry practice to create an ambiguity, even before the language of the contract is itself analyzed to determine if an ambiguity lies within the four corners of the contract.

Jowett's reliance on *Metric* is misplaced, and this case does not support Jowett. We agree that the parties to a contract, just like patent applicants, can be their own lexicographers and that trade practice may serve that lexicographic function in some cases. In *Metric*, the contract required that "[n]ew lamps shall be installed immediately prior to completion of the project." *Id.* at 749. The government urged that this provision on its face required the replacement of all lamps. The contractor, in contrast, despite the plain language,

---

**2.** When a contract is susceptible to more than one reasonable interpretation, it contains an ambiguity. *Hills Materials Co. v. Rice*, 982 F.2d 514, 516 (Fed.Cir.1992). An ambiguity may be patent or latent. A patent ambiguity is one that is "so glaring as to raise a duty to inquire." *Id.* at 516 n. 3. A latent ambiguity, on the other hand, is not glaring, substantial, or patently obvious. *Grumman Data Sys. Corp. v. Dalton*, 88 F.3d 990, 997 (Fed.Cir. 1996). "Where such a latent ambiguity exists, the court will construe the ambiguous term against the drafter of the contract when the nondrafter's interpretation is reasonable." *Hills Materials*, 982 F.2d at 516.

interpreted the provision as only requiring the replacement of defective, broken, or burned out lamps, and urged that the term "relamping" would have been used if the parties had intended to require the replacement of all lamps, as was the industry practice. *Id.* at 749–50.

The court concluded that the contractor had introduced sufficient evidence of trade practice and custom, and reasonable reliance on that practice and custom, to show that the pertinent contract specifications were "susceptible to two different reasonable interpretations." *Id.* at 753. The court based this determination on the absence of the term "relamping" from the contract. *Id.*

This case is quite unlike *Metric.* Here there is no term in the contract that has an accepted industry meaning different from its ordinary meaning. Nor is there, as in *Metric* itself, a term with an accepted industry meaning that was omitted from the contract. In short, Jowett has not established that there is an ambiguity in the contract language by reference to trade practice and custom. *See Gholson, Byars & Holmes Constr. Co. v. United States,* 173 Ct.Cl. 374, 351 F.2d 987, 999 (1965) ("[T]rade usage or custom may show that language . . . has, in fact, a meaning different from its ordinary meaning"); *see also* 5 Samuel Williston, *Williston on Contracts* § 648, at 6–7 (3d ed. 1961) ("Usage is an ordinary means of proving the local or technical meaning of language, and even language which is normally clear and unambiguous may be shown by usage to bear, under the circumstances of the case, a meaning different from its normal sense."); 3 Arthur L. Corbin, *Corbin on Contracts* § 555, at 233–34 (1960) (noting that trade "evidence often establishes a special and unusual meaning definitely in conflict with the more common and ordinary usages").

As we understand it, Jowett nonetheless makes three distinct trade practice arguments based on its affidavits. First, Jowett urges that there was an industry practice of not insulating air supply ducts located in ceilings. This argument relies on nearly identical paragraphs in two affidavits which affirm that it is not "standard practice in the greater Baltimore/Washington area" to insulate air supply ducts in ceilings.

However, affidavits describing a supposed common industry practice of not insulating air supply ducts in ceilings are simply irrelevant where the language of the contract is unambiguous on its face. It is well-established that the government can vary from the norm in the trade when contracting for goods and services. *R.B. Wright Constr. Co. v. United States,* 919 F.2d 1569, 1572–73 (Fed.Cir.1990).

Second, again relying on the affidavits, Jowett urges, in somewhat convoluted fashion, that there was a well-established practice of not applying duct insulation to ceilings which form plenums, and that the contract exclusion in paragraph 3.3j for "duct insulation on . . . ceilings which form plenums" was unnecessary as applied to the ceilings themselves. Therefore, says Jowett, paragraph 3.3j should be read to refer to the ducts within the ceiling spaces. However, there is nothing unusual in writing established trade practice into the contract as a specific exception. Indeed, including such specific language is highly desirable. In any event, Jowett's argument assumes that the language is ambiguous, and we have held that it is not.

Finally, the affidavits state that the industry executives would not read this contract as requiring the insulation of the cold-air supply ducts in the ceilings. Jowett urges us to rely upon these affidavits to find that the contract unambiguously exempted the ducts at issue from the duct insulation requirement. However, as discussed above, affidavits that those familiar with trade practices in the construction industry would interpret the specifications differently are irrelevant, unless they identify a specific term that has a well-under-

stood meaning in the industry and that was used in, or omitted from, the contract.

Under these circumstances, Jowett's generalized affidavits provide no basis for upholding its interpretation of the contract, one which would vary the plain language of the contract. We hold that the contract unambiguously required Jowett to insulate the cold-air supply ducts inside the ceiling spaces of the office building.[3]

## CONCLUSION

For the foregoing reasons, the decision of the Court of Federal Claims is affirmed.

## COSTS

No costs.

*AFFIRMED.*

**3.** In reaching this result, we do not address the role of trade practice in cases where the contract specifications at issue are on their face ambiguous. *See Metric,* 169 F.3d at 753.