Notice: This opinion is subject to formal revision before publication in the Federal Reporter or U.S.App.D.C. Reports. Users are requested to notify the Clerk of any formal errors in order that corrections may be made before the bound volumes go to press.

# United States Court of Appeals

FOR THE DISTRICT OF COLUMBIA CIRCUIT

————

Argued October 22, 2002          Decided March 11, 2003

No. 01-7156

KISKA CONSTRUCTION CORPORATION, U.S.A., AND
KAJIMA ENGINEERING AND CONSTRUCTION, INCORPORATED,
A PARTNER IN KISKA–KAJIMA, A JOINT VENTURE,
APPELLANTS

v.

WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY,
APPELLEE

————

Appeal from the United States District Court
for the District of Columbia
(No. 97cv02677)

————

*Kenneth W. Starr* argued the cause for the appellants. *Christopher Landau* and *Grant M. Dixton* were on brief.

*Kenneth B. Weckstein* argued the cause for the appellee. *Phillip T. Staub* was on brief.

————

Bills of costs must be filed within 14 days after entry of judgment. The court looks with disfavor upon motions to file bills of costs out of time.

Before: GINSBURG, *Chief Judge*, HENDERSON, *Circuit Judge,* and WILLIAMS, *Senior Circuit Judge*.

Opinion for the court filed by *Circuit Judge* HENDERSON.

KAREN LECRAFT HENDERSON, *Circuit Judge*: Appellee Washington Metropolitan Area Transit Authority ("WMATA") contracted with Appellants KiSKA Construction Corporation–U.S.A. and Kajima Engineering and Construction, Inc. (collectively "KiSKA") in early 1994 to construct two subway tunnels in Washington, D.C. for a fixed price of $43 million. After experiencing various difficulties completing the project, KiSKA filed suit against WMATA in the United States District Court for the District of Columbia alleging counts of: (1) fraudulent misrepresentation; (2) negligent misrepresentation; (3) unilateral mistake; (4) material breach of contract; and (5) quantum meruit.

The district court dismissed KiSKA's two tort claims— fraudulent misrepresentation and negligent misrepresentation—for lack of subject matter jurisdiction, concluding that WMATA had not waived its sovereign immunity from liability for torts occurring in the performance of a governmental function. The district court then granted summary judgment to WMATA on KiSKA's quantum meruit claim. After a five-week trial on the remaining contract claims, the jury returned a verdict for WMATA on both counts. The district court subsequently entered final judgment in WMATA's favor on March 23, 2001 and denied KiSKA's motion for a new trial on August 20, 2001.

On appeal, KiSKA challenges three pre-trial rulings that the district court's August 20, 2001 opinion and order incorporated by reference. First, KiSKA argues that the district court erred in dismissing its tort claims on sovereign immunity grounds. Second, KiSKA argues that the district court misinterpreted the contract's dewatering provisions. Third, KiSKA argues that the district court likewise misinterpreted the contract's grout hole provisions. We find all three of KiSKA's challenges to be without merit and, accordingly, affirm the judgment of the district court.

## I.  Background

### A.  The 14th Street Tunnel Project

This litigation arises out of the extension of WMATA's Green Line subway train under 14th Street in Washington, D.C.  Before soliciting bids for the tunnel project, WMATA retained an outside technical expert, GZA GeoEnvironmental, Inc. ("GZA"), to analyze the subsurface conditions in the project area and to study the feasibility of various tunneling methods, tunneling equipment and dewatering systems.[1] GZA submitted its first Tunnel Alternative Report ("TAR") in November 1992.  The first TAR reported that "[g]roundwater for most of the [tunnel] alignment is anticipated to be above the crown [*i.e.*, the top of the tunnel]," and that, in light of this soil condition, "even . . . fairly extensive dewatering" was not likely to be entirely "[e]ffective."  Joint Appendix (JA) 30–31.  Accordingly, GZA recommended not only that "some type of closed face tunnel boring machine" be used for the project, but also that "open face tunneling be strictly prohibited on this contract."[2]  JA 31.

GZA submitted a revised TAR in January 1993.  The second TAR reaffirmed the conclusions of the first, noting that "dewatering considerations dictate closed face mining methods," JA 32, and that "[o]pen faced tunneling in conjunction with dewatering is not judged a viable construction technique on this [c]ontract," JA 33.  After reviewing the second TAR, WMATA's Board of Engineers met with GZA.  Shortly thereafter, in March 1993, GZA issued a third and final TAR, which authorized the use of an open face machine,

---

[1] Dewatering systems use a combination of dewatering wells and control piezometers to reduce hydrostatic pressure and to control and remove both groundwater and surface water from the tunnel excavation during construction.

[2] An open face tunnel boring machine is "essentially a cylinder with a digging mechanism in the center of it, much like a backhoe that you might see on the streets of the city."  JA 495.  A closed face machine is also "a cylinder, but as its name describe[s], the face is closed."  JA 495.

but cautioned that "[e]xtensive dewatering will be an essential element of the open faced shield option." JA 34. Noting that "effective dewatering of the alignment is at best going to be difficult," the third TAR recommended that "an extensive pre-support grouting/ground improvement program ... be required for most of the alignment."[3] JA 35.

Following the issuance of the third TAR, GZA calculated the extent of the dewatering and grouting necessary to allow for open face tunneling. Even extensive pre-support grouting would not permit open face tunneling, GZA warned WMATA, "if groundwater is not depressed [through dewatering] the recommended two feet below tunnel invert [*i.e.*, the bottom of the tunnel]." JA 35. WMATA then directed GZA to design an appropriate dewatering system for the project. GZA produced a dewatering design that included over three hundred dewatering wells. JA 1045–46

On December 6, 1993, WMATA issued an Invitation for Bids ("IFB") on the 14th Street tunnel project. The IFB set forth detailed design specifications and required bidders to submit lump-sum bids for carrying out the work based upon those specifications.[4] WMATA did not include GZA's TARs in the bid package, however, nor did WMATA conform the design specifications to GZA's recommended dewatering system. In particular, WMATA's design specifications called for only 61 dewatering wells. JA 40. Based upon the specifications provided by WMATA, KiSKA submitted a lump-sum bid of approximately $43 million. WMATA accepted KiSKA's bid and, in early 1994, the two parties signed a construction contract.

---

[3] "Pre-support grouting involves drilling holes into the ground in a regular pattern, and then filling them with a fluid mixture of cement, water, and chemicals, which spreads out into the soil and hardens to form a stable, continuous canopy over the tunnel." Br. for Appellant at 8.

[4] A design specification describes in precise detail the materials to be employed and the manner in which the construction work is to be performed. *P.R. Burke Corp. v. United States*, 277 F.3d 1346, 1357 (Fed. Cir. 2002).

*B. The Dewatering and Grout Hole Provisions*

Section 205 of the contract governed dewatering. It not only set forth a detailed dewatering system for the project, but also required KiSKA to implement the system specified therein: "The Contractor shall proceed with the installation of the specified dewatering system as soon as possible after notice to proceed." Contract § 205, ¶ 1.1(A). Two subsections touched on the question whether the contract required the dewatering system to maintain the groundwater level at two feet below tunnel invert. Section 205(1.2)(B)(3) read, in pertinent part, as follows:

> For mined earth tunnels, additional wells beyond the specified minimum dewatering system may be required to effectively reduce hydrostatic pressure and control groundwater in soil surrounding each tunnel in order to prevent the following:
>
> a. Heaving of the invert, blowups, hazardous seepage and sudden flow of soil in tunnel face.
> b. Loss of ground and surface subsidence.
> c. Maintain groundwater 2 feet below invert.

*Id*. § 205, ¶ 1.2(B)(3). Section 205(1.1)(A) also addressed dewatering, stating that "[t]he designed dewatering system may not eliminate all groundwater from the tunnel excavation. The Contractor shall be prepared to support the tunnel face … and to handle and convey groundwater from the tunnel to appropriate discharge locations." *Id*. § 205, ¶ 1.1(A). This subsection further provided that "[a]dditional dewatering wells may be required based on the observed performance of the dewatering system." *Id*.

Section 239 of the contract covered pre-support chemical grouting, specifying the precise location of thousands of surface pre-support grout holes to stabilize the soil around the tunnels. In particular, Section 239(1.1)(B) provided that "[p]re-support chemical grouting shall be preformed [sic] from the existing ground surface at locations shown on the contract drawings." *Id*. § 239, ¶ 1.1(B). Although these drawings depicted grout holes drilled vertically at five-foot

intervals in a diamond grid pattern, *see* JA 1001, Section 239(3.2)(A) stated that grout piping should be installed "horizontally, vertically or inclined, as required," Contract § 239, ¶ 3.2(A). "In [the] case of [a] discrepancy between Drawings and Specifications," the contract's General Provisions provided that "the Specifications shall govern." JA 755.

## C. The Pre–Trial Rulings

During the tunnel's construction, KiSKA experienced a number of difficulties with both the dewatering system and the excavation methods required by the contract. Two complications proved particularly troublesome: (1) the dewatering system specified by WMATA failed to lower the groundwater table two feet below the tunnel invert and (2) the great majority of surface grout holes could not be drilled vertically at their specified locations without damaging underground utility lines. Although KiSKA overcame these difficulties and eventually completed the project, it did so at a cost of almost double its $43 million lump-sum bid. Upon completion of the project, KiSKA filed a five-count complaint against WMATA asserting both tort and contract claims.

Before the case went to trial, the district court issued several pre-trial rulings, three of which KiSKA now challenges on appeal. First, the district court dismissed KiSKA's tort claims on sovereign immunity grounds, holding that "the challenged decisions are 'susceptible to policy judgment,' and therefore immune from judicial review, because they involve planning and design rather than implementation or operation." *KiSKA Constr. Corp. v. WMATA*, Civ. No. 97–2677 at 5 (D.D.C. Feb. 7, 2000) (mem.) (First Order). Second, the district court held that the contract was "ambiguous, but not patently so," with respect to whether the contract required that the dewatering system maintain the groundwater level at two feet below tunnel invert. *KiSKA Constr. Corp. v. WMATA*, Civ. No. 97–2677 at 7 (D.D.C. June 9, 2000) (mem.) (Second Order).[5] Third, the district court held that while

---

[5] The district court reached this conclusion in the course of rejecting WMATA's motion for partial summary judgment, which

"the contract affords no flexibility with regard to the *locations* of grout drillings," *KiSKA Constr. Corp. v. WMATA*, Civ. No. 97–2677 at 8 (D.D.C. Dec. 22, 2000) (mem.) (Third Order) (emphasis in original), the contract permitted KiSKA "to drill all grout holes, including surface grout holes, 'horizontally, vertically or inclined,'" *id.* at 9 (quoting Contract § 239, ¶ 3.2(A)).[6]

## II.  Analysis

We review *de novo* the dismissal of KiSKA's tort claims for lack of subject matter jurisdiction, accepting as true all of the factual allegations contained in the complaint.[7]  *Sturm, Ruger*

---

had asked the district court to "rule as a matter of law that the contract did not require that the dewatering system lower the groundwater to two feet below the bottom of the tunnel."  Second Order at 1.

[6] The district court addressed whether the contract mandated the vertical drilling of grout holes in the course of rejecting WMATA's argument that the contract's "utilities clause" rendered WMATA immune from liability.  Third Order at 1–9.  The utilities clause provided, in pertinent part, as follows:

> a.  . . . The Contract Drawings show some known public and private utilities in their approximate locations within the limits of the project which are expected to interfere with the work.  The Contractor is, however, cautioned that these locations are not guaranteed, nor is there any guarantee that utilities lines in existence within the limits of the project have been shown. . . .

> b.  . . . Before commencing construction, the Contractor shall verify the locations of utilities which may be affected by his operations. . . .

Contract § 101, ¶ III(D)(18).

[7] Relying on *Herbert v. Nat'l Acad. of Sciences*, 974 F.2d 192, 197–98 (D.C. Cir. 1992), WMATA argues that we should consider facts outside of the pleadings in reviewing the district court's dismissal of KiSKA's tort claims.  We disagree.  Under settled law, the district court may dispose of a motion to dismiss for lack of subject matter jurisdiction "on the complaint standing alone."  *Id.*

*& Co. v. Chao*, 300 F.3d 867, 871 (D.C. Cir. 2002). We review the district court's construction of the contract between KiSKA and WMATA under the same *de novo* standard. *LTV Corp. v. Gulf States Steel, Inc.,* 969 F.2d 1050, 1055 (D.C. Cir.), *cert. denied*, 506 U.S. 1022 (1992) ("Interpretation of the plain language of a contract is a question of law subject to *de novo* review by this court.").

## A. Sovereign Immunity

On appeal, KiSKA argues that the district court erred by dismissing its two tort claims—fraudulent misrepresentation and negligent misrepresentation—on sovereign immunity

at 197. Nevertheless, where necessary, the district court may also consider undisputed facts evidenced in the record or disputed facts resolved by the district court. *Id.* As we explained in *Herbert*, however, "[t]he posture in which the motion is presented to [the] trial court has a profound effect on the manner in which this Court will review its disposition." *Id.*

The district court's February 7, 2000 Memorandum Opinion dismissing KiSKA's tort claims indicates—in a footnote—that "[a] more thorough summary of the facts of this case can be found in the Court's Memorandum Opinion of June 19, 1998." First Order at 2 n.2. This earlier opinion, which denied WMATA's first motion to dismiss, "deduced" certain jurisdictional facts "as presented in the [c]omplaint and the contract." *KiSKA Constr. Corp. v. WMATA*, Civ. No. 97–2677 at 2 (D.D.C. June 19, 1998) (mem.). WMATA relies upon the district court's "incorporation" of the previously "deduced" facts in support of its position that the district court looked beyond the four corners of the complaint in dismissing KiSKA's tort claims on sovereign immunity grounds. WMATA is mistaken. A review of the district court's February 7, 2000 Memorandum Opinion reveals that the district court made no determination of disputed jurisdictional facts in holding that KiSKA's tort claims involved discretionary decisions evincing policy judgment and, as a result, that the claims were barred by sovereign immunity. First Order at 3–7. Given that the district court accepted as true the factual allegations of the complaint, *see id.* at 1–7, "the only matter[ ] before us on appeal [is] whether the [d]istrict [c]ourt's application of the law is correct," *Herbert*, 974 F.2d at 197.

grounds. Rejecting the district court's conclusion that WMATA had "broad discretion in defining the contours of the invitation for bids," First Order at 6, KiSKA asserts that WMATA lacks the " 'discretion' to conceal and/or misrepresent material information" from contractors and that "such tortious conduct does not involve the exercise of a 'policy judgment,' " Br. for Appellant at 20. Thus, KiSKA maintains, sovereign immunity does not shield WMATA from KiSKA's tort claims.

### 1.   Discretionary Functions vs. Ministerial Functions

WMATA is the product of an interstate compact entered into by Maryland, Virginia and the District of Columbia. *Watters v. WMATA*, 295 F.3d 36, 39 (D.C. Cir. 2002). We have frequently recognized that, " '[a]s a quasi-governmental entity created by its signatory parties, WMATA is entitled to share the sovereign immunity of those parties with respect to common law tort actions.' " *Beatty v. WMATA*, 860 F.2d 1117, 1126 (D.C. Cir. 1988) (quoting *Heffez v. WMATA*, 569 F. Supp. 1551, 1552 (D.D.C. 1983)). We have also acknowledged, however, that section 80 of the WMATA Compact provides a limited waiver of WMATA's sovereign immunity for torts " 'committed in the conduct of any proprietary function,' " but not for torts occurring " 'in the performance of a governmental function.' " *Beebe v. WMATA*, 129 F.3d 1283, 1287 (D.C. Cir. 1997) (quoting D.C. CODE ANN. § 9–1107.01(80)). Unless the limited waiver of immunity applies, "the district court lacks jurisdiction to enter a judgment against [WMATA]." *Watters*, 295 F.3d at 39–40.

Because "the distinction between proprietary and governmental functions has created a 'quagmire that has long plagued the law of municipal corporations,' " *Beatty*, 860 F.2d at 1126 (quoting *Indian Towing Co. v. United States*, 350 U.S. 61, 65 (1955)), we have interpreted section 80 "as incorporating the distinction between discretionary and ministerial functions," a dichotomy set forth in the Federal Tort Claims Act ("FTCA"), *Dant v. District of Columbia*, 829 F.2d 69, 74 (D.C. Cir. 1987). Given that "[o]nly those activities consid-

ered 'discretionary' are shielded by sovereign immunity," *Burkhart v. WMATA*, 112 F.3d 1207, 1216 (D.C. Cir. 1997), WMATA's immunity "turns on whether the [challenged] activity is 'discretionary' or 'ministerial,'" *Beebe*, 129 F.3d at 1287.[8]

To determine whether a WMATA activity is discretionary, and thus shielded by sovereign immunity, we apply a two-part test culled from the FTCA's "discretionary function" jurisprudence.[9] *See id.* First, we ask "whether any ' "statute, regulation, or policy specifically prescribes a course of action for an employee to follow." ' " *Id.* (quoting *Cope v. Scott*, 45 F.3d 445, 448 (D.C. Cir. 1995) (quoting *United States v. Gaubert*, 499 U.S. 315, 322 (1991))). If a course of action is so prescribed, "sovereign immunity does not bar suits based on an employee's failure to follow the prescribed course of conduct." *Burkhart*, 112 F.3d at 1217. If the governing statutes or regulations leave room for the exercise of discretion, however, we ask a second question: "whether the exercise of discretion is 'grounded in "social, economic, or political goals." ' " *Beebe*, 129 F.3d at 1287 (quoting *Cope*, 45 F.3d at 448 (quoting *Gaubert*, 499 U.S. at 323)). If the exercise of discretion is so grounded, and hence "susceptible to policy judgment," *Cope*, 45 F.3d at 448, the "activity is 'governmen-

_____

[8] WMATA's sovereign immunity likewise extends to "quintessential" governmental functions, such as law enforcement. *Beebe*, 129 F.3d at 1287. Indeed, we typically ask whether the challenged activity amounts to a "quintessential" governmental function before asking whether the activity is "discretionary" or "ministerial." *See id.* We need not ask the former question here, however, because "WMATA has not attempted to shoe-horn its activities into this narrow category of conduct." First Order at 4 n.4.

[9] We have described the distinction between "discretionary" and "ministerial" functions as follows: " 'Generally speaking, a duty is discretionary if it involves judgment, planning, or policy decisions. It is not discretionary [*i.e.*, ministerial] if it involves enforcement or administration of a mandatory duty at the *operational level*, even if professional expert evaluation is required.' " *Beatty*, 860 F.2d at 1127 (emphasis in original) (quoting *Jackson v. Kelly*, 557 F.2d 735, 737–38 (10th Cir. 1977)).

tal,' thus falling within section 80's retention of sovereign immunity," *Beebe*, 129 F.3d at 1287.

### 2. The Contents of the Bid Package: A Discretionary Decision?

This case poses the following question: does WMATA's discretion to select a particular project design encompass the discretion to determine the content of that project's bid package?[10] On appeal, KiSKA answers this question in the negative, arguing that (1) WMATA lacks the discretion to "conceal and/or misrepresent material information" from contractors and (2) "such tortious conduct does not involve the exercise of a 'policy judgment.'" Br. for Appellant at 20.[11]

---

[10] Not surprisingly, the parties disagree as to whether KiSKA's tort claims amount to a challenge to WMATA's design decisions. This dispute reflects the fact that we have long held that WMATA's design decisions are discretionary functions shielded by sovereign immunity. *See, e.g.*, *Souders v. WMATA*, 48 F.3d 546 (D.C. Cir. 1995) (WMATA immune from challenge to noise level guidelines); *Dant*, 829 F.2d at 73–75 (WMATA immune from challenge to fare collection system). A careful reading of the complaint reveals, however, that KiSKA's tort claims stem from WMATA's decision not to include GZA's three TARs in the bid package and *not* WMATA's decision to select a particular project design over another. JA 24–66.

KiSKA's reliance upon *Beatty* is similarly misplaced. Although *Beatty* recognized that WMATA may be held "liable for a broad range of conduct which implements its discretionary decisions," *Beatty*, 860 F.2d at 1127, the case involved the *implementation* of a design decision, *i.e.*, the Red Line's uninstalled iron beams. It thus sheds no light on whether WMATA's selection of a particular bid package is more properly cast as a "design" decision or as an "implementation" decision.

[11] Noting that the FTCA contains both a "discretionary function" exception and a "misrepresentation" exception to the waiver of sovereign immunity contained therein, whereas the WMATA Compact includes only the former, KiSKA also argues that section 80 does not afford WMATA immunity from tort suits alleging claims of misrepresentation. But, as WMATA correctly observes, we have

Applying the two-stage analysis outlined above, *see supra* Part II.A.1, we find that KiSKA has failed to cite any statute, regulation or policy that "specifically prescribes" the content of WMATA's IFBs. Unable to identify support for its position within the four corners of the WMATA Compact, KiSKA relies upon two external sources of authority to argue that WMATA failed, in this case, to follow the prescribed course of conduct: (1) contract cases that recognize a government agency's duty to disclose pertinent facts to contractors with whom the agency contracts, Br. for Appellant at 23–24, and (2) a Federal Transit Administration ("FTA") circular providing that all contract solicitations must " '[i]ncorporate a clear and accurate description of the technical requirements for the material, product, or service to be procured,' " *id.* at 24 (quoting JA 1068).

KiSKA maintains that the general obligation to abide by the covenant of good faith and fair dealing "specifically prescribed" the contents of the bid package, requiring WMATA to disclose to KiSKA all "material" information. We disagree. Although the covenant of good faith and fair dealing undoubtedly constrains WMATA's behavior within the context of its contractual relationships, KiSKA's misrepresentation claims sound in tort, not contract. Given that section 80 distinguishes between tort claims and contract claims, affording a limited waiver of sovereign immunity with respect to the former and a complete waiver of sovereign immunity with respect to the latter, D.C. CODE ANN. § 9–1107.01(80), we must agree with the district court's conclusion that the covenant of good faith and fair dealing "is not the kind of *specific* dictate that renders WMATA's acts merely ministerial," First Order at 6 (emphasis in original). *Cf. Burkhart*, 112 F.3d at 1217 (holding that employment provisions of WMATA Compact "hardly constrain" WMATA's discretion over whom it will employ and how it will train and supervise employees).

previously upheld the dismissal of fraud and misrepresentation claims against WMATA where the challenged activities involved discretionary decisions. *See Beebe*, 129 F.3d at 1286, 1288.

The FTA circular likewise fails to circumscribe WMATA's discretion with respect to the contents of the bid package.[12] A regulation constrains discretion if it " 'specifically prescribes a course of action for an employee to follow' " such that " 'the employee has no rightful option but to adhere to the directive.' " *Gaubert*, 499 U.S. at 322 (quoting *Berkovitz v. United States*, 486 U.S. 531, 536 (1988)). Although the FTA circular obligates WMATA to "[i]ncorporate a clear and accurate description of the technical requirements for the material, product, or service to be procured," JA 1068, the circular does not "specifically prescribe" a course of action for WMATA to follow in specifying the contents of a bid package. In our view, an administrative ukase that mandates only clarity and accuracy does not constrain WMATA's discretion with respect to the particular documents to include within a bid package. *Cf. Appalachian Power Co. v. EPA*, 208 F.3d 1015, 1023 (D.C. Cir. 2000). Given KiSKA's failure to produce persuasive authority to the contrary, we conclude that WMATA had broad discretion to determine the contents of the tunnel project's bid package.[13]

Next, KiSKA argues that WMATA cannot satisfy the second step of the sovereign immunity inquiry, *i.e.*, whether the exercise of such discretion is "grounded in social, economic, or political" policy. *Cope*, 45 F.3d at 448 (internal quotations omitted). As we recognized in *Cope*, "[d]etermining whether a decision is 'essentially political, social, or economic' is admittedly difficult, since nearly every government action is, at least to some extent, subject to 'policy analysis.' " *Id.* (quot-

---

[12] Although WMATA claims that KiSKA did not rely upon the FTA circular before the district court, the record indicates otherwise. JA 135. Accordingly, KiSKA has not waived this argument.

[13] As WMATA correctly observes, at least one court has expressly held that government decisions regarding the content of plans and specifications provided to contractors are immune discretionary functions. *See Frank Briscoe Co. v. County of Clark*, 643 F. Supp. 93, 97–98 (D. Nev. 1986), *aff'd*, 857 F.2d 606 (9th Cir. 1988) (interpreting discretionary function exemption under Nevada law in accordance with FTCA principles). Unfortunately, the *Frank Briscoe* decision contains little reasoning in support of its decision. *See id.*

ing *Red Lake Band of Chippewa Indians v. United States*, 800 F.2d 1187, 1195 (D.C. Cir. 1986)). " 'Budgetary constraints,' " we observed, " 'underlie virtually all economic activity.' " *Id.* at 449 (quoting *ARA Leisure Servs. v. United States*, 831 F.2d 193, 196 (9th Cir. 1987)).

To avoid the exception swallowing the rule, we have held that the "mere association of a decision with regulatory concerns is not enough [to render that decision 'discretionary']; exempt decisions are those 'fraught with . . . public policy considerations.' " *Id.* (quoting *Sami v. United States*, 617 F.2d 755, 767 (D.C. Cir. 1979)). We therefore concluded in *Cope* that "[t]he mere presence of choice—even if that choice involves whether money should be spent—does not trigger the [discretionary function] exemption." *Id.*

WMATA argues that its "employees had to, and did, exercise judgment when they decided that the [bid package] would not benefit from [the] inclusion of superseded, discarded design concepts." Br. for Appellee at 31. Citing the court's decision in *Red Lake*, WMATA maintains that its decisions regarding the manner in which its policies are implemented or enforced are "themselves discretionary because such decisions directly affect the feasibility and practicality of the program, and require the agency to establish priorities for the accomplishment of its policy objectives by balancing the objectives sought to be obtained against such practical considerations as staffing and funding." *Id.* at 31–32 (quoting *Red Lake*, 800 F.2d at 1196 (internal quotations omitted)). WMATA thus reasons that its "decision not to include thousands of pages of draft or superseded design documents in the bid package is a perfect example of such discretion." *Id.* at 32.

While KiSKA's claim presents a closer question than those decided in cases past, we believe that the district court correctly held that WMATA's discretionary decision to exclude certain design documents from the tunnel project's bid package is "susceptible to policy judgment." *Cope*, 45 F.3d at 448. Specifically, WMATA's decision required consideration of budgetary constraints and economic expediency. While at first glance WMATA's fiscal considerations may appear to pale in comparison to those implicated in hiring decisions, *see*

15

*Beebe*, 129 F.3d at 1287–88; *Burkhart*, 112 F.3d at 1217, those considerations involve more than simply packaging, duplication and distribution costs. If WMATA were to release unreliable or mistaken reports indicating an inflated need for dewatering wells, for example, the reports could cause contractors to similarly inflate their bids. Of course, WMATA may not withhold all unfavorable information from contractors; if it did, WMATA might soon find few firms willing to submit bids on its projects. WMATA must therefore exercise its policy judgment to balance the goal of fair disclosure against the sensible withholding of unreliable information.

Although KiSKA argues that WMATA's position "assumes the *merits* of the issue, *i.e.*, that the information concealed from bidders was not 'material,'" Reply Br. at 9 (emphasis in original), KiSKA's position, in contrast—given that the merits of a claim will rarely be known before a court establishes its jurisdiction over that claim—would permit endless contractor challenges to WMATA's final specifications. While KiSKA may disagree with WMATA's decisions regarding the materiality of a given set of documents, such judgments are, in our view, WMATA's to make. We therefore conclude that the content of the tunnel project's bid package is a discretionary decision susceptible to policy judgment and, accordingly, affirm the district court's dismissal of KiSKA's tort claims on sovereign immunity grounds.[14]

### B. The Contract Provisions

KiSKA's remaining challenges involve the district court's interpretation of two contract provisions: section 205 (dewatering) and section 239 (pre-support grouting). Both challenges rely upon *United States v. Spearin*, 248 U.S. 132 (1918), "[t]he seminal case recognizing a cause of action for breach of contractual warranty of specifications," *Hercules*

---

[14] Given our conclusion that the district court correctly dismissed KiSKA's tort claims on sovereign immunity grounds, we need not consider WMATA's alternative argument that the district court's dismissal of KiSKA's tort claims constituted "harmless error."

*Inc. v. United States*, 516 U.S. 417, 424 (1996), which held that "if [a] contractor is bound to build according to plans and specifications prepared by the owner, the contractor will not be responsible for the consequences of defects in the plans and specifications," *Spearin*, 248 U.S. at 136. Relying on *Spearin*, KiSKA argues that WMATA warranted by implication that (1) its dewatering system would lower the groundwater table in the project area two feet below the tunnel invert and (2) the surface pre-support grout holes required under the contract could be drilled vertically at the precise locations specified by WMATA.

### 1. The Dewatering System

KiSKA maintains that the district court erred as a matter of law in holding that the contract was "ambiguous" as to whether the contract required—and thus warranted—that the dewatering system would lower the groundwater table in the project area two feet below the tunnel invert. Relying chiefly on section 205(1.2)(B)(3), KiSKA argues that the contract specifically and unambiguously warranted that the groundwater table would be lowered two feet below the invert of the tunnel by the dewatering system WMATA designed. In KiSKA's view, none of the provisions relied on by WMATA abrogates the "clear" statement contained in section 205(1.2)(B)(3) and, accordingly, KiSKA claims that its reading of the contract provides the only "reasonable" interpretation of the dewatering provisions contained therein. Its argument fails.

Section 205(1.2)(B)(3) provided that "[f]or mined earth tunnels, additional wells beyond the specified minimum dewatering system may be required to . . . control groundwater in [the] soil surrounding each tunnel in order to . . . *[m]aintain* groundwater 2 feet below invert." Contract § 205, ¶ 1.2(B)(3) (emphasis added). Noting that the groundwater table could not be "maintain[ed]" two feet below the tunnel invert if it was not already at that level, KiSKA asserts that section 205 required, and hence warranted, that WMATA's dewatering system would indeed lower the groundwater table to two feet

below tunnel invert. In KiSKA's view, its reading of section 205(1.2)(B)(3) is confirmed by section 228(1.5)(A)(2)(a)((1)), which provided: "The water table *shall* be lowered as specified in the Specification Section 205." *Id.* § 228, ¶ 1.5(A)(2)(a)((1)) (emphasis added).

WMATA, however, reads section 205(1.2)(B)(3) not as an implied warranty but as "a statement that the minimum dewatering system *might not* lower the groundwater to two feet below invert [and that KiSKA] might have to install additional wells to accomplish that goal." Br. for Appellee at 40 (emphasis in original).[15] According to WMATA, section 205(1.1)(A) likewise put KiSKA on notice that groundwater may remain in the tunnel despite the dewatering system. Contract § 205, ¶ 1.1(A) ("The designed dewatering system may not eliminate all groundwater from the tunnel excavation."). WMATA further asserts that both section 228(1.5)(A)(1) and section 228(3.5)(A) suggest that groundwater could remain above the tunnel invert without violating the contract. *Id.* § 228, ¶ 1.5(A)(1) (providing that KiSKA must "[c]ontrol groundwater along the tunnel alignment and *within the tunnel heading* to prevent" certain specified events from occurring) (emphasis added); *id.* § 228, ¶ 3.5(A) ("If the tunnel invert is *below* groundwater level, [KiSKA must] maintain qualified personnel on duty to monitor conditions that might threaten stability of heading whenever tunnel excavation is suspended or shut down.") (emphasis added).

The law requires contracts to be read as a whole, with meaning given to every provision contained therein. *See Fort*

---

[15] WMATA also maintains that KiSKA waived any challenge to the district court's ruling that the dewatering provisions were ambiguous because KiSKA never made its own motion seeking a ruling that the contract was unambiguous. This argument is without merit. Although the district court ruled on WMATA's motion for summary judgment, *both* KiSKA and WMATA argued that they offered the only reasonable interpretation of the contract's dewatering provisions. Second Order at 5. As KiSKA correctly observes, once the district court held that the contract was "ambiguous" in this regard, KiSKA did not need to file its own motion for summary judgment in order to preserve the issue for appeal.

*Sumter Tours, Inc. v. Babbitt*, 202 F.3d 349, 357 (D.C. Cir. 2000) (citing *United States v. Ins. Co. of N. Am.*, 83 F.3d 1507, 1511 (D.C. Cir. 1996) (noting the " 'cardinal principle of contract construction: that a document should be read to give effect to all its provisions' ") (quoting *Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 63 (1995))). If the contract "is susceptible to more than one reasonable interpretation," however, the court must find that the contract is ambiguous as a matter of law. *Metric Constructors, Inc. v. NASA*, 169 F.3d 747, 751 (Fed. Cir. 1999).

If the court finds the contract to be ambiguous, it must then determine whether that ambiguity is patent or latent. *Id.* An ambiguity is patent if it is "glaring, substantial, or patently obvious." *Comtrol, Inc. v. United States*, 294 F.3d 1357, 1365 (Fed. Cir. 2002). Patent ambiguities are construed against a government contractor absent an inquiry "about the correct meaning of the terms at issue." *P.R. Burke Corp. v. United States*, 277 F.3d 1346, 1353 (Fed. Cir. 2002). If the ambiguity is "neither glaring nor substantial nor patently obvious," *Grumman Data Sys. Corp. v. Dalton*, 88 F.3d 990, 997 (Fed. Cir. 1996) (internal quotations omitted), however, and therefore latent, the ambiguity is ordinarily construed against the drafting party, *see, e.g.*, *Jowett, Inc. v. United States*, 234 F.3d 1365, 1368 & n.2 (Fed. Cir. 2000).

Applying these principles, the district court concluded that both KiSKA and WMATA proposed reasonable interpretations of the contract's dewatering provisions, holding the contract to be "ambiguous, but not patently so." Second Order at 7. We disagree and find the provisions to be patently—not latently—ambiguous.

Although KiSKA provides a sensible explanation for each of the provisions relied upon by WMATA,[16] we do not accept

---

[16] Responding to WMATA's reliance on section 205(1.1)(A), KiSKA argues that "[a] recognition that the system might not eliminate every last isolated pocket of groundwater from the project area . . . is in no way inconsistent with a warranty that the design would lower the overall groundwater *table* for the project area two feet below the invert." Br. for Appellant at 33 (emphasis in

KiSKA's assertion that section 205(1.2)(B)(3) provided a "clear" statement that WMATA warranted that its design would lower the groundwater table two feet below tunnel invert. The grammatical difficulties of the provision aside, *see infra* note 17, section 205(1.2)(B)(3) cannot, in our opinion, carry the interpretive weight placed upon it by KiSKA. Contract § 205, ¶ 1.2(B)(3). Section 228(1.5)(A)(2)(a)((1)) likewise fails to advance KiSKA's cause as it appears to speak to the manner of dewatering and not to the level at which the groundwater must be maintained. *Id.* § 228, ¶ 1.5(A)(2)(a)((1)).

In our view, the grammatical errors of section 205(1.2)(B)(3) render the ambiguity of the dewatering provisions sufficiently obvious that KiSKA had a duty to inquire as to the true meaning of the contract.[17] *See P.R. Burke Corp.*, 277 F.3d at 1353. By failing to so inquire, KiSKA assumed the risk that the government would offer a reasonable, but conflicting, interpretation, *see Triax Pacific, Inc. v. West*, 130 F.3d 1469, 1474–75 (Fed. Cir. 1997), which interpretation would then be accepted by the court—a risk realized by our rejection of KiSKA's claim, *see Jowett*, 234 F.3d at 1368 & n.2.

### 2. Pre–Support Grout Holes

Finally, KiSKA argues that the district court erred as a matter of law by holding that, while "the contract affords no flexibility with regard to the *locations* of grout drillings," Third Order at 8 (emphasis in original), the contract "permitted [KiSKA] to drill all grout holes, including surface grout

---

original). Similarly, discussing WMATA's reliance on section 228(3.5)(A), KiSKA asserts that the provision "merely anticipated a contingency in the event that the groundwater table were to rise above the invert." *Id.*

[17] As WMATA observes on appeal, the applicability of the verb "prevent" to section 205(1.2)(B)(3)(c) "makes no sense grammatically or syntactically." Br. for Appellee at 40 n.15. KiSKA maintains, however, that "[r]ead in context, it is perfectly clear that the verb 'prevent' does not apply to the clause beginning '[m]aintain.'" Reply Br. at 18 n.6.

holes, 'horizontally, vertically or inclined,'" *id.* at 9 (quoting Contract § 239, ¶ 3.2(A)). Specifically, KiSKA maintains that the contract specified that "all such grout holes must be drilled vertically." Br. for Appellant at 37–38. Because KiSKA could not drill the surface grout holes vertically at many of the locations specified in the contract without drilling into existing utilities, KiSKA reasons that WMATA breached its contractual warranty of specifications. We reject KiSKA's argument.

Section 239(1.1)(B) provided that "[p]re-support chemical grouting shall be preformed [sic] from the existing ground surface at locations shown on the contract drawings." Contract § 239, ¶ 1.1(B). As even WMATA concedes, the contract drawings depicted the surface grout holes as drilled vertically. *See* JA 1001. Yet section 239(3.2)(A) provided that grout pipes were to be installed "horizontally, vertically or inclined, as required." Contract § 239, ¶ 3.2(A). Observing that the contract contained "no clear directive that the [surface grout] holes should be drilled at a particular angle," the district court concluded that "the flexible language of [section 239(3.2)(A)] applies." Third Order at 8–9. Accordingly, the district court held that "the contract permitted [KiSKA] to drill all grout holes, including surface grout holes, 'horizontally, vertically or inclined.'" *Id.* at 9 (quoting Contract § 239, ¶ 3.2(A)).

On appeal, KiSKA argues that the district court's reliance upon section 239(3.2)(A) was misplaced because the provision "did not remotely purport to override any other provisions of the contract requiring particular grout holes to be drilled at particular angles." Br. for Appellant at 40. KiSKA places particular emphasis upon the fact that section 239(3.2)(A) provided that "the contractor shall drill grout holes 'as required.'" *Id.* at 41 (quoting Contract § 239, ¶ 3.2(A)). Because the contract drawings depicted the grout holes as drilled vertically, KiSKA argues that the contract "required" the surface grout holes to be drilled vertically, thus warranting that the surface grout holes *could* be drilled vertically.

We find that KiSKA's reading of the contract places too much emphasis on the contract drawings, while ignoring other crucial provisions of the contract. As WMATA correctly observes, General Provision No. 2 of the contract clearly stated that "[i]n [the] case of [a] discrepancy between Drawings and Specifications, the Specifications shall govern." JA 755. Given that the contract unambiguously indicated that WMATA did not know the location of the utilities and, in addition, expressly assigned KiSKA the responsibility of ultimately locating the utilities, KiSKA's reading of the contract cannot stand. *See, e.g.*, Contract § 101, ¶ III(D)(18)(a) ("The Contract Drawings show some known public and private utilities in their approximate locations within the limits of the project which are expected to interfere with the work. The Contractor is, however, cautioned that these locations are not guaranteed, nor is there any guarantee that utilities lines in existence within the limits of the project have been shown."); *id.* § 101, ¶ III(D)(18)(b) ("Before commencing construction, the Contractor shall verify the locations of utilities which may be affected by his operations."); *id.* § 207, ¶ 1.5(A)(2) ("[The contractor must] [v]erify by field investigation locations of [utility] facilities within and adjacent to limits of project which may be affected by construction operations."). Read in conjunction with section 239(3.2)(A)'s mandate to drill surface grout holes "horizontally, vertically or inclined, as required," *id.* § 239, ¶ 3.2(A), the aforementioned provisions sufficiently refute KiSKA's warranty argument.[18]

### III.   Conclusion

For the foregoing reasons, we conclude that (1) sovereign immunity bars KiSKA's tort claims; (2) the contract did not unambiguously provide that the specified dewatering system would maintain the groundwater level two feet below tunnel invert; and (3) the contract did not require KiSKA to drill

---

[18] Because we conclude that the district court correctly interpreted the contract's dewatering and grout hole provisions, we need not consider WMATA's alternative argument that any error the district court committed in interpreting the contract was harmless.

surface grout holes vertically.  The judgment below is there-
fore

*Affirmed.*