# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued January 25, 2021        Decided July 27, 2021

No. 20-7017

LUSIK USOYAN, ET AL.,
APPELLEES

v.

REPUBLIC OF TURKEY,
APPELLANT

Consolidated with 20-7019

Appeals from the United States District Court
for the District of Columbia
(No. 1:18-cv-01141)

*Mark E. Schamel* argued the cause for appellant. With him on the briefs were *David S. Saltzman, Cathy A. Hinger,* and *Victoria A. Bruno.*

*Agnieszka M. Fryszman* argued the cause for appellees. With her on the brief were *Steven R. Perles, Edward B. MacAllister, Joshua K. Perles, Douglas M. Bregman, Stephen J. Whelan, Jennifer M. Wiggins, Michael E. Tigar, Mark S. Sullivan,* and *Joshua Colangelo-Bryan. Andreas N. Akaras* entered an appearance.

*Neil H. Koslowe* was on the brief for *amicus curiae* Chris Stanley, et al. in support of appellees.

*Brian M. Boynton*, Acting Assistant Attorney General, U.S. Department of Justice, and *Sharon Swingle* and *Daniel Winik*, Attorneys, *Richard C. Visek*, Acting Legal Adviser, Department of State, were on the brief for *amicus curiae* United States of America in support of affirmance.

Before: HENDERSON, MILLETT and WILKINS, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* HENDERSON.

KAREN LECRAFT HENDERSON, *Circuit Judge*: On May 16, 2017, Turkish security forces violently clashed with a crowd of protesters outside the Turkish ambassador's residence in Washington, D.C. Injured protesters, led by Lusik Usoyan (Usoyan) and Kasim Kurd (Kurd), filed two lawsuits in district court against the Republic of Turkey. Turkey moved to dismiss all claims against it, asserting defenses of foreign sovereign immunity, the political question doctrine and international comity. Rejecting all three defenses, the district court allowed both suits to proceed. In this consolidated appeal, we affirm.

## I. Background

Many members of the Turkish expatriate community are strongly opposed to Turkey's president, Recep Tayyip Erdogan. They consider him a strongman who rules by decree, violates civil rights, illegally detains and tortures his own citizens and terrorizes Turkey's Kurdish population. Thus, when President Erdogan announced that he was visiting Washington, D.C. in May 2017, several anti-Erdogan protests were planned—three of which are relevant to this litigation.

The facts that follow are drawn from the district court's orders herein. *See Usoyan v. Republic of Turkey*, 438 F. Supp. 3d 1 (D.D.C. 2020); *Kurd v. Republic of Turkey*, 438 F. Supp. 3d 69 (D.D.C. 2020).

On May 16, a small group of protesters assembled near Lafayette Square, directly adjacent to the White House, while President Erdogan met with President Trump at the White House. The protesters had a valid permit and protested peacefully. Then, approximately twenty of the Lafayette Square protesters migrated to Sheridan Circle, assembling on the sidewalk directly across the street from the Turkish ambassador's (Ambassador) residence. They correctly anticipated that the residence would be President Erdogan's first stop upon leaving the White House. The anti-Erdogan protesters carried signs and chanted through a bullhorn. According to Turkey, some of them had flags or signs supporting the Kurdistan Workers Party (PKK), which the U.S. government has designated a foreign terrorist organization. Others may have had paraphernalia associated with the People's Protection Unit (YPG), which Turkey considers an alter ego of the PKK.

Meanwhile, a far larger counter-demonstration, comprising pro-Erdogan civilians and Turkish security forces, assembled on the side of the street adjacent to the Ambassador's residence. Both groups yelled, taunted and threatened each other. Officers from the Metropolitan Police Department (MPD) formed a cordon between the two camps, trying to keep the peace. Nevertheless, shortly after 4 p.m., pro- and anti-Erdogan demonstrators entered the street that was supposed to separate the groups. Despite police presence, the two sides clashed. It is unclear which side started the row. What we do know is that it took MPD about one minute to restore peace. Both camps sustained injuries.

Once police got each group back on its respective sidewalk, the pro-Erdogan demonstrators began pleading with law enforcement to clear away the protesters before President Erdogan arrived at the residence. One Turkish government employee allegedly told an MPD officer, "You need to take them; if you don't, I will."

At approximately 4:10 p.m., President Erdogan's vehicle arrived at the residence. What happened next is disputed. The plaintiffs claim that President Erdogan spoke with his head of security and ordered an attack on the protesters. Defendant Turkey denies this. What neither side disputes, however, is that the pro-Erdogan group—including the Turkish security detail—moved decisively against the protesters. The attack commenced at approximately 4:13 p.m., while President Erdogan remained sitting in his vehicle near the entrance to the residence. After reviewing videotape of the incident, the district court gave the following description:

> [T]he protesters remained standing on the designated sidewalk. Turkish security forces and other pro-Erdogan individuals then crossed a police line to attack the protesters. The protesters did not rush to meet the attack. Instead, the protesters either fell to the ground, where Turkish security forces continued to kick and hit them, or ran away, where Turkish security forces continued to chase and otherwise attack them. The Turkish security forces violently physically attacked the protesters. Defendant Turkey argues that President Erdogan was within range of a possible handgun, improvised explosive device, or chemical weapon attack. Even if the Court assumes this to be true, at the time of the second attack, the protesters were merely standing on the Sheridan Circle sidewalk. Defendant Turkey points to no

indication that an attack by the protesters was imminent.

*Usoyan*, 438 F. Supp. 3d at 20 (internal citation omitted). Having reviewed video of the altercation ourselves, we find no clear error with this statement of facts. *See Price v. Socialist People's Libyan Arab Jamahiriya*, 389 F.3d 192, 197 (D.C. Cir. 2004).

Plaintiff Lacy MacAuley makes a factually unique allegation. MacAuley was not present at the protests outside the White House or the Ambassador's residence. Understanding that the Turkish Embassy (Embassy) was President Erdogan's next stop after the Ambassador's residence, she created an anti-Erdogan sign and walked toward the Embassy. Before reaching the Embassy, MacAuley stopped at a police barricade and began yelling. After President Erdogan's motorcade passed, multiple members of the Turkish security detail emerged from a vehicle and ran toward MacAuley, surrounding her. They covered her mouth, grabbed her wrist and seized her sign before MPD intervened.

The two groups of plaintiffs allege substantially the same facts. Both groups press claims of assault, battery, intentional infliction of emotional distress and violation of D.C. Code 22-3704, which ordinance creates a civil cause of action for injuries that demonstrate an accused's prejudice based on, *inter alia*, the victim's race or national origin. Separately, the *Usoyan* plaintiffs also allege negligent infliction of emotional distress, loss of consortium, civil conspiracy and civil claims under the Justice Against Sponsors of Terrorism Act, *see* 18 U.S.C. § 2333; 28 U.S.C. § 1605B(c). The *Kurd* plaintiffs separately allege false imprisonment, as well as civil claims under the Alien Tort Statute, *see* 28 U.S.C. § 1350.

Turkey moved to dismiss all claims. First and foremost, it claimed foreign sovereign immunity with respect to the entirety of both complaints. Additionally, it argued that all claims were non-justiciable by virtue of the political question doctrine and international comity. After the district court denied Turkey's motions to dismiss, Turkey filed two interlocutory appeals, consolidated pursuant to a joint motion of the parties.

We have jurisdiction to review the denial of a motion to dismiss based on sovereign immunity. *Azima v. RAK Inv. Auth.*, 926 F.3d 870, 874 (D.C. Cir. 2019). We have pendent jurisdiction to review Turkey's arguments under the political question and international comity doctrines. *Id.*; *see also Jungquist v. Sheikh Sultan Bin Khalifa Al Nahyan*, 115 F.3d 1020, 1026–27 (D.C. Cir. 1997).

## II. Foreign Sovereign Immunity

Under the Foreign Sovereign Immunities Act (FSIA), 28 U.S.C. §§ 1602 *et seq.*, a foreign state is "presumptively immune from the jurisdiction of United States courts." *Saudi Arabia v. Nelson*, 507 U.S. 349, 355 (1993). The FSIA codifies a limited number of exceptions to the presumption, which exceptions are "the sole basis for obtaining jurisdiction over a foreign state in our courts." *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 434 (1989).

The district court determined that it had jurisdiction under the FSIA's "tortious acts exception," which strips immunity in any case

> in which money damages are sought against a foreign state for personal injury or death, or damage to or loss of property, occurring in the United States and caused by the tortious act or omission of that foreign state or

of any official or employee of that foreign state while acting within the scope of his office or employment; except this paragraph shall not apply to—

> (A) any claim based upon the exercise or performance or the failure to exercise or perform a discretionary function regardless of whether the discretion be abused.

28 U.S.C. § 1605(a)(5), (a)(5)(A). Invoking the § 1605(a)(5)(A) exception to the exception, Turkey argues that the "discretionary function" exception preserves its sovereign immunity.

The FSIA's discretionary function exception is modeled after a similarly worded exception in the Federal Tort Claims Act (FTCA), 28 U.S.C. § 2680(a). *See* H.R. Rep. 94-1487, at 21 (1976), *as reprinted in* 1976 U.S.C.C.A.N. 6604, 6620. Because the United States Supreme Court has not yet interpreted the FSIA's discretionary function exception, we look to what it has said about the FTCA's analogous provision. *See MacArthur Area Citizens Ass'n v. Republic of Peru*, 809 F.2d 918, 921–22 (D.C. Cir. 1987) (FTCA precedent provides "guidance" in FSIA cases). Using the same rationale, the district court applied FTCA precedent *mutatis mutandis*.

The Supreme Court has said that the FTCA's discretionary function exception applies—and sovereign immunity is preserved—if two conditions are met. *First*, there must be no "federal statute, regulation, or policy [that] *specifically prescribes* a course of action for an employee to follow." *Berkovitz v. United States*, 486 U.S. 531, 536 (1988) (emphasis added). *See also United States v. Gaubert*, 499 U.S. 315, 322 (1991). *Second*, the employee's exercise of discretion must be "the kind that the discretionary function exception was designed to shield"—that is, "based on considerations of public

policy." *Berkovitz*, 486 U.S. at 536–37. *See also Gaubert*, 499 U.S. at 322–23. The district court held that only the first *Berkovitz* condition was satisfied. Reviewing *de novo*, *see de Csepel v. Republic of Hungary*, 714 F.3d 591, 597 (D.C. Cir. 2013), we agree.

## A. First *Berkovitz* Condition

Under *Berkovitz*, we first determine whether the challenged conduct "involves an element of judgment or choice." 486 U.S. at 536 (citing *Dalehite v. United States*, 346 U.S. 15, 34 (1953)). An action is not discretionary if an employee is "bound to act in a particular way." *Gaubert*, 499 U.S. at 329. If a governing law or policy "mandates particular conduct" and the employee violates the mandate, "there will be no shelter from liability because there is no room for choice."[1] *Id.* at 324. Nor is an action discretionary if "the decisionmaker is acting without actual authority." *Red Lake Band of Chippewa Indians v. United States*, 800 F.2d 1187, 1196 (D.C. Cir. 1986). *See also Birnbaum v. United States*, 588 F.2d 319, 329 (2d Cir. 1978) (discretionary function "can derive only from properly delegated authority"). In essence, *Berkovitz*'s first condition asks whether the challenged conduct is rightfully the product of independent judgment. *See Berkovitz*, 486 U.S. at 536 (citing *Westfall v. Erwin*, 484 U.S. 292, 296–97 (1988)).

We see two issues that need to be resolved. *First*, Turkey is a foreign power and—as Turkey itself concedes—its agents do not have the authority to perform law enforcement functions

---

[1] Of course, if a regulation mandates particular conduct and "the employee obeys the direction, the Government will be protected because the action will be deemed in furtherance of the policies which led to the promulgation of the regulation." *Id.* at 324.

inside the United States. *See* Restatement (Fourth) of the Foreign Relations Law of the United States § 432(b) (Am. L. Inst. 2018) ("[A] state may not exercise jurisdiction to enforce in the territory of another state.").[2] Accordingly, if we are to find that the Turkish security detail was exercising its discretion in taking its challenged actions, we must identify the source of that discretion. *Second*, whatever the source of Turkey's discretion, the plaintiffs allege that Turkey exceeded that discretion by violating various laws of Washington, D.C. We must also determine, then, whether these alleged violations take Turkey's conduct outside the ambit of the discretionary function exception.

**1.**

In FTCA cases, we usually do not ponder the source of the government's discretion. The cases typically arise in contexts in which the government's authority to act is uncontroversial. For example, there is little debate that the government has discretion when it administers a program of government contracts, *see Sloan v. HUD*, 236 F.3d 756, 760 (D.C. Cir. 2001), arrests a criminal suspect, *see Shuler v. United States*, 531 F.3d 930, 934 (D.C. Cir. 2008), or maintains roadways on federal land, *see Cope v. Scott*, 45 F.3d 445, 450 (D.C. Cir. 1995). In FTCA cases, analysis of *Berkovitz*'s first condition generally focuses on whether the government's discretion is altered or removed by law or policy rather than its discretion *in initio*.

---

[2] "A state typically exercises jurisdiction to enforce through its law-enforcement officers . . . . Examples of jurisdiction to enforce include the search of a place, the arrest of a person, imprisonment after criminal conviction, and the seizure of property." *Id.* at § 432 cmt. a.

There are exceptions, of course. *Red Lake Band* involved a 1979 uprising on an Indian reservation. *See* 800 F.2d at 1188. At the time, a police force run by the Bureau of Indian Affairs (BIA) was responsible for law enforcement on the reservation. *Id.* at 1188–89. The lawsuit arose out of actions taken by a Federal Bureau of Investigation (FBI) special agent who, after arriving on the scene, took command of the BIA officers. It was uncontested that the agent's actions were outside the FBI's statutory mandate. *Id.* at 1189 (citing parties' joint statement). Because the agent acted "outside the scope of his authority," his actions were also "outside the scope of the discretionary function exception." *Id.* at 1197. Thirty years later, we relied on *Red Lake Band* for the proposition that "constitutionally ultra vires conduct" cannot be discretionary. *Loumiet v. United States*, 828 F.3d 935, 944–45 (D.C. Cir. 2016).[3] Similarly, in *Birnbaum*, the Second Circuit held that "a discretionary function can only be one within the scope of authority of an agency or an official" insofar as it is "delegated by statute, regulation, or jurisdictional grant." 588 F.2d at 329. Because the Central Intelligence Agency's statutory charter did not give it authority to collect intelligence regarding domestic matters, it had no authority to participate in a mail-opening program with the FBI. Accordingly, the discretionary function exception did not apply. *See id.*

---

[3] *Loumiet* reasoned that "the absence of a limitation on the discretionary-function exception for constitutionally ultra vires conduct would yield an illogical result: the FTCA would authorize tort claims against the government for conduct that violates the mandates of a statute, rule, or policy, while insulating the government from claims alleging on-duty conduct so egregious that it violates the more fundamental requirements of the Constitution." *Id.*

Because U.S. law does not confer the same powers on foreign sovereigns as it does on the federal government, the question of an employee's initial authority to act is more likely to exist in an FSIA case. If a foreign government has no authority to take a certain type of action in the United States, its employee's action in that sphere cannot constitute an exercise of discretion. We need not ponder whether Turkey's discretion was taken away if it never existed in the first place. The first *Berkovitz* condition therefore requires that we understand the source of Turkey's discretion—if any—to defend visiting officials using physical force.

During oral argument, counsel for both parties were asked about the source of the Turkish security detail's authority to use physical force in the United States. Although the plaintiffs' counsel responded that there was no evidence that the Turkish security detail "received any authorization to act in any manner," Turkey's counsel maintained that the security detail's authority was grounded in "the international law about the relations between sovereigns."

We invited the United States to provide its views "on the source and scope of any discretion afforded to foreign security personnel with respect to taking physical actions against domestic civilians on public property." In its brief, the United States declares that no source of positive law explicitly grants Turkey the authority to use physical force in the protection of diplomats on U.S. soil. Instead, the United States locates Turkey's right in customary international law:

> The principle that sending states are authorized to protect diplomats and officials traveling abroad has not been codified in a treaty, as has the obligation of receiving states to protect foreign diplomatic and consular personnel, but that does not reflect any

uncertainty about whether the authority exists. To the contrary, this principle is widely accepted in international practice and reflects the fact that nations have inherent authority to protect their diplomats and senior officials outside their borders, subject to the authorization of the receiving state.

Although the United States does not use the phrase "customary international law," that is the clear implication of its reference to international practice and the "inherent authority" of nations. Customary international law, after all, is simply the "general and consistent practice of states followed by them from a sense of legal obligation."[4] Restatement (Third) of the Foreign Relations Law of the United States § 102(2) (Am. L. Inst. 1987).

The plaintiffs seize on the Government's statement, noting that Turkey did not "identify any statute, regulation, or other source of law that either confers or limits its discretion to act" nor did the Government "identify any such specific authorization in this case." Turkey responds that the Government's position is consistent with its own view that its right to protect President Erdogan with physical force inheres in its sovereignty.

We think that Turkey—following the United States' lead—has the better view. International law is the source of many powers that are incidental to sovereignty. Although the United States Constitution does not affirmatively grant the

---

[4] Despite its lack of codification, customary international law "has essentially the same binding force under international law as treaty law." Curtiss A. Bradley & Jack L. Goldsmith, *Customary International Law as Federal Common Law: A Critique of the Modern Position*, 110 Harv. L. Rev. 815, 818 (1997) (citing Restatement (Third) at § 102 cmt. j).

federal government the power to "acquire territory by discovery and occupation," "expel undesirable aliens" or "make such international agreements as do not constitute treaties in the constitutional sense," the Supreme Court has described these powers as "inherently inseparable from the conception of nationality." *United States v. Curtiss-Wright Exp. Corp.*, 299 U.S. 304, 318 (1936). And in each case, the Court found the power not in the Constitution or some other source of positive law but, instead, in "the law of nations." *Id.* (citing *Jones v. United States*, 137 U.S. 202, 212 (1890) (territory); *Fong Yue Ting v. United States*, 149 U.S. 698, 705 *et seq.* (1893) (aliens); *B. Altman & Co. v. United States*, 224 U.S. 583, 600–01 (1912) (treaties)). The United States' view, then, is legally plausible.

The next question is whether it is well-supported. As evidence of international law, we look to obvious sources like treaties and legislative acts, *see The Paquete Habana*, 175 U.S. 677, 700 (1900), as well as "the general usage and practice of nations" and "judicial decisions recognizing and enforcing that law," *Filartiga v. Pena-Irala*, 630 F.2d 876, 880 (2d Cir. 1980) (quoting *United States v. Smith*, 18 U.S. (5 Wheat.) 153, 160–61 (1820)).

The United States first notes that diplomats should be able to execute their duties in safety and without fear of molestation.[5] Of this proposition we have no doubt. The

---

[5] The parties assume that the inviolability of foreign diplomats extends to a foreign head of state. Although this may be a safe assumption in modern times, it was not always the case. During the Middle Ages, "envoys enjoyed more security than their principals." Linda S. Frey & Marsha L. Frey, *The History of Diplomatic Immunity* 83 (1999). On the rare occasion that a ruler negotiated in-person, he was forced to take precautions. *See id.* at 83–84. The Gothic king Alaric II suggested meeting the Frankish king Clovis

Vienna Convention on Diplomatic Relations—ratified by the United States in 1972—declares that "[t]he person of a diplomatic agent shall be inviolable." Vienna Convention on Diplomatic Relations and Optional Protocol on Disputes, Art. 29, Apr. 18, 1961, 23 U.S.T. 3227, T.I.A.S. No. 7502 (entered into force in U.S. Dec. 13, 1972). The Supreme Court has recognized that this "concern for the protection of ambassadors and foreign ministers even predates the Constitution." *Boos v. Barry*, 485 U.S. 312, 323 (1988). *See also Frend v. United States*, 100 F.2d 691, 693 (D.C. Cir. 1938) ("[A]mbassadors, public ministers, and consuls, charged with friendly national intercourse, are objects of especial respect and protection." (quoting Pres. Fillmore, Message to Congress, Dec. 2, 1851)). Emer de Vattel's 1758 treatise called violence against a foreign minister "an offense against the law of nations." 4 E. de Vattel, *The Law of Nations* § 82, at 465 (J. Chitty ed. 1844).

A sending state's right to use force in defense of its officials, however, does not necessarily follow from the right of those officials to carry out their business unmolested. As the United States notes, "[t]here is good reason to assign receiving states the primary responsibility for protecting visiting foreign government officials." We made a similar point when faced with a First Amendment challenge brought by individuals who sought to demonstrate outside the Nicaraguan embassy: "Peace and dignity would be destroyed outright" if "the task of repulsing invasions of the embassy and

---

alone on an island. Louis the German and Charles the Bald met on an island in the Rhine; one year later, relying on the threat of religious sanction to deter bad behavior, the two kings met in a church. The Saxon leader Widukind demanded an exchange of hostages before agreeing to confer with Charlemagne. Unsurprisingly, "[r]ulers increasingly delegated their diplomatic duties to others." *Id.* at 84.

its grounds would be left largely to the foreign nation's security forces." *Finzer v. Barry*, 798 F.2d 1450, 1463 (D.C. Cir. 1986), *rev'd in part on other grounds sub nom. Boos v. Barry*, 485 U.S. 312 (1988). In sum, the inviolability of diplomats suggests, but does not affirmatively establish, that a sending state has the right to use force in the defense of diplomats.

Next, the United States refers to the Government's practice overseas. U.S. diplomats and diplomatic facilities are protected by the State Department's Bureau of Diplomatic Security, U.S. Marine Corps security guards and local contractors. The United States argues that this principle is reciprocal and that the reciprocity has been impliedly codified: although aliens on non-immigrant visas are generally prohibited from possessing firearms in the United States, *see* 18 U.S.C. § 922(g)(5)(B), the Congress exempts "foreign law enforcement officer[s] of a friendly foreign government entering the United States on official law enforcement business," *id.* at § 922(y)(2)(D).

Reciprocity undoubtedly "governs much of international law in this area." *Boos*, 485 U.S. at 323 (citing Clifton E. Wilson, *Diplomatic Privileges and Immunities* 32 (1967)). Thus, we give significant weight to the Government's contention that "[t]he United States would not rely entirely on a foreign government, even that of a close ally, to protect senior U.S. officials traveling abroad; nor would the United States expect other nations to fully cede the protection of their diplomats and senior officials to our own personnel."

Finally, we note that the United States' legal position is itself evidence of international law, *see Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 432–33 (1964) (Executive Branch is "an interpreter of generally accepted and traditional rules" of international law), and worthy of some deference. In

*Al Bahlul v. United States*, for example, we said that a "highest-level Executive Branch deliberation is worthy of respect in construing the law of war." 767 F.3d 1, 25 (D.C. Cir. 2014) (en banc) (citing *Sosa v. Alvarez-Machain*, 542 U.S. 692, 733–34 (2004)) (referring to Attorney General's legal opinion to President Andrew Johnson). And this is a hoary principle. In *Jones v. United States*, for example, the Supreme Court deferred to the President's international law determination that a certain island was not subject to Haiti's jurisdiction. *See* 137 U.S. at 214, 222–23. *See also Williams v. Suffolk Ins. Co.*, 38 U.S. (13 Pet.) 415, 418 (1839) (similar); *Ex parte Republic of Peru*, 318 U.S. 578, 589 (1943) (in pre-FSIA suit against Peruvian vessel, State Department request that vessel be declared immune was conclusive). Although the Government's legal brief—even when offered as a non-party—may lack the force of a presidential decree, the Executive Branch often speaks through its lawyers. *See Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 417 (2003) (Solicitor General speaks for State Department); *Al-Bihani v. Obama*, 619 F.3d 1, 46 (D.C. Cir. 2010) (Kavanaugh, J., concurring in denial of reh'g en banc) (Executive Branch speaks through Justice Department's Office of Legal Counsel and Office of Solicitor General).

In summary, the United States' legal position is well-reasoned and comports with the strong evidence that a sending state has a right in customary international law to protect diplomats and other high officials representing the sending state abroad. Accordingly, we agree with its determination.

**2.**

Although we have established that the Turkish security detail had a right to protect President Erdogan, that does not automatically satisfy *Berkovitz*'s first condition. We must

address the plaintiffs' argument that "Turkey did not have discretion to commit criminal assaults." Turkey allegedly violated several District of Columbia laws, including assault with a dangerous weapon and aggravated assault, *see* D.C. Code §§ 22-402, 404.01.[6] After reviewing the entire record, including video footage of the confrontations, we think it clear that the plaintiffs' allegations are plausible. *See Loumiet*, 828 F.3d at 946 (plaintiffs must "plausibly allege[]" government violated legal mandate). *See also Gaubert*, 499 U.S. at 324–25. We also note that fifteen members of the Turkish security detail were subsequently indicted by the United States on criminal assault charges. The remaining question is whether these allegations strip Turkey's immunity.

We conclude that Turkey's immunity is not removed by the plaintiffs' allegations that it violated local law. Unless a "*specific* directive exists," we cannot say that an employee has "no choice" in his actions. *Cope*, 45 F.3d at 448 (emphasis added) (internal quotations omitted). Not every law prescribes specific conduct. When a contractor sued the Washington Metropolitan Area Transit Authority (WMATA) for not including a certain technical report in a bid solicitation, we rejected the argument that WMATA's duties of good faith and fair dealing "specifically prescribed" the inclusion of certain content in its solicitations. *KiSKA Const. Corp. v. Wash. Metro. Area Transit Auth.*, 321 F.3d 1151, 1159–60 (D.C. Cir. 2003). WMATA still had "broad discretion to determine the

---

[6] These alleged violations are not synonymous with the claims pressed in the *Kurd* and *Usoyan* complaints. Like the *Loumiet* plaintiffs, the plaintiffs here allege one set of violations that forms their cause of action and another—closely related—set that attempts to negate the discretionary function defense. *See* 828 F.3d at 945–46 (citing *Limone v. United States*, 579 F.3d 79, 102 & n.13 (1st Cir. 2009)).

contents of the . . . bid package" so it retained immunity. *Id.* at 1160. *See also Banneker Ventures, LLC v. Graham*, 798 F.3d 1119, 1138–39 (D.C. Cir. 2015) (applying *KiSKA*). Similarly, in *Cope*, certain laws required the United States Park Service to "work with other agencies to establish and implement highway safety programs." 45 F.3d at 450 (first citing 23 U.S.C. § 402 (1988 & Supp. V. 1993); and then citing 23 C.F.R. §§ 1230.1–4 (1994)). But these laws did not "contain directives so precise that they constrain[ed] the Park Service's control" over its roads. *Id.*

In the abstract, it can be difficult to determine whether a law is so specific that its violation takes challenged conduct outside the discretionary function exception. But *Cope* provides a good guideline: "If a specific directive exists," then the "only issue is whether the employee followed the directive, and is thus exempt," or, alternatively, "whether the employee did not follow the directive, thus opening the government to suit." 45 F.3d at 448. Refraining from assaulting protestors would not have automatically made the Turkish security detail's conduct discretionary. Likewise, generally applicable laws prohibiting criminal assault did not give the Turkish security detail a sufficiently "specific directive" to strip Turkey of its immunity.[7]

---

[7] The Ninth Circuit recently held that a foreign sovereign's discretion "is not evaluated by [U.S. law], but rather by the corresponding limitations that bind *that* sovereign, whether contained in its own domestic law or (we will assume) in applicable and established principles of international law." *Broidy Cap. Mgmt., LLC v. State of Qatar*, 982 F.3d 582, 591 (9th Cir. 2020). We need not go so far. To whatever extent *Broidy* holds that the discretionary act of a foreign state on American soil is unaffected by U.S. law, we disagree. Granted, U.S. law "does not rule world" but there is a presumption that it "governs domestically." *Kiobel v. Royal Dutch*

This is not to suggest that violation of a proscription never implicates the first *Berkovitz* condition. What is important is not whether a law or policy is phrased in affirmative or negative terms—prescribing or prohibiting certain conduct—but how specifically the directive speaks to the challenged conduct. In *Banneker*, we saw "no difference between a prescription by policy *that leaves no room for choice* and a proscription *that does the same*." 798 F.3d at 1143 (emphasis altered). There, the challenged conduct was an alleged violation of WMATA's Standards of Conduct which prohibited, *inter alia*, leaking confidential information. *Id.* at 1144. The proscription plainly limited the employee's "room for choice" but not every proscription does the same. *Accord Fagot Rodriguez v. Republic of Costa Rica*, 297 F.3d 1, 10 (1st Cir. 2002) ("A general obligation to avoid unlawful activity—applicable to everyone in the United States—is hardly sufficient to remove all room for choice."). Unlike a prohibition against disclosing specific information, a criminal assault ordinance operates at too high a level of generality to satisfy *Berkovitz*'s "specific prescription" requirement, at least if it "does not impose any special obligations on" the employee whose conduct is challenged. *Id.*

*Loumiet* is not to the contrary. There, we held that the "discretionary-function exception does not provide a blanket immunity against tortious conduct that a plaintiff plausibly alleges also flouts a constitutional prescription." 828 F.3d at 943. *Loumiet* was decided in the FTCA context, where the defendant is always the United States. But the United States Constitution does not bind foreign states, *see*, *e.g.*, *Downes v.*

---

*Petroleum Co.*, 569 U.S. 108, 115 (2013) (quoting *Microsoft Corp. v. AT&T Corp.*, 550 U.S. 437, 454 (2007)). We believe a foreign state's policy discretion is constrained *both* by its own law *and* by applicable U.S. law.

*Bidwell*, 182 U.S. 244, 270 (1901); *Naoko Ohno v. Yuko Yasuma*, 723 F.3d 984, 993 (9th Cir. 2013); *United States v. Kole*, 164 F.3d 164, 175 (3d Cir. 1998), so it would be inaccurate to describe Turkey's challenged conduct as a constitutional violation.

Moreover, as noted *supra*, we think *Loumiet* relies on the same logic that *Red Lake Band* and *Birnbaum* apply. These cases involve the *source* of an employee's authority, not *constraints* placed on that authority. *Loumiet* quoted *Red Lake Band*'s statement that a government official cannot be said to be exercising his discretion if he violates a law that "define[s] the extent of his official powers." 828 F.3d at 944 (quoting *Red Lake Band*, 800 F.2d at 1196). In *Red Lake Band* and *Birnbaum*, FBI and CIA employees, respectively, took actions that were outside their agencies' statutory charters. The Constitution is the charter for the entire government, *see Martin v. Hunter's Lessee*, 14 U.S. (1 Wheat.) 304, 326, 332 (1816), and if a government employee's action goes beyond constitutional boundaries, his action is no less *ultra vires* than if an FBI agent commandeers a tribal police force or a foreign state engages in unauthorized law enforcement activity in the United States. In summary, *Loumiet* supports the proposition that the discretionary function exception does not apply if an employee acts without a delegation of initial authority. We do not agree with the plaintiffs' reading of *Loumiet* to say that any plausibly alleged violation of a local ordinance strips a foreign state of sovereign immunity.[8]

---

[8]    *MacArthur* also commented—albeit indirectly—on the consequences of violating local law. *See* 809 F.2d at 922 n.4. There, Peru was alleged to have violated the District of Columbia's zoning laws. *See id.* at 919. Even if this were construed as a criminal violation, we said that it was "hardly clear" that it would "automatically prevent designation of Peru's acts as discretionary."

**B. Second *Berkovitz* Condition**

The FSIA, like the FTCA, does not shield all exercises of discretion. Under *Berkovitz*, the discretionary function exception "protects only governmental actions and decisions based on considerations of public policy." 486 U.S. at 537. Mere "garden-variety" discretion receives no protection. *Cope*, 45 F.3d at 448. Only discretionary actions "grounded in social, economic, and political policy" fall within the exception. *Gaubert*, 499 U.S. at 323. *See also Red Lake Band*, 800 F.2d at 1195–96. "Grounded in" does not mean "motivated by." Our focus "is not on the agent's subjective intent" but rather "on the nature of the actions taken." *Gaubert*, 499 U.S. at 325.

Determining which discretionary actions qualify is "admittedly difficult"—after all, "nearly every government action is, at least to some extent, subject to 'policy analysis.'" *Cope*, 45 F.3d at 448. But we have resisted invitations to shield actions implicating only "the faintest hint of policy concern[]." *Id.* at 449. Moreover, blatantly careless or malicious conduct cannot be recast in the language of cost-benefit analysis.

---

*Id.* at 922 n.4. Granted, *MacArthur* hinted that the situation might be different for *mala in se* crimes. *See id.* For that proposition, it referred to *Letelier v. Republic of Chile*, a frequently cited district court case dealing with a foreign government's alleged assassination of a Chilean political dissident in the District of Columbia. *See* 488 F. Supp. 665, 665 (D.D.C. 1980). *Letelier* made a broad assertion: "there is no discretion to commit, or to have one's officers or agents commit, an illegal act"—at least if the act is "clearly contrary to the precepts of humanity as recognized in both national and international law." *Id.* at 673. But even if the *Letelier* decision were binding on us, the plaintiffs have not argued that the Turkish security detail's actions violated "precepts of humanity" and thus we need not address that question.

*Berkovitz*'s second condition is met "only where the question is not negligence but social wisdom, not due care but political practicability, not reasonableness but economic expediency." *Id.* at 450 (internal quotations omitted).

In a "fact-specific decision," the district court concluded that Turkey's actions were not covered by the exception. *Usoyan*, 438 F. Supp. 3d at 20. We agree. Although the Turkish security detail's protective mission was discretionary as a general matter, that does not mean that every action a Turkish officer may take is an immunized exercise of that discretion. Discrete injury-causing actions can, in certain cases, be "sufficiently separable from protected discretionary decisions to make the discretionary function exception inapplicable." *Moore v. Valder*, 65 F.3d 189, 197 (D.C. Cir. 1995), *abrogated on other grounds by Ziglar v. Abbasi*, 137 S. Ct. 1843 (2017). In *Moore*, we spoke of the vast discretion committed to federal prosecutors while at the same time recognizing that a prosecutor's decision to disclose grand jury testimony to unauthorized parties was not "inextricably tied" to his discretion. *Id. Accord Linder v. United States*, 937 F.3d 1087, 1091 (7th Cir. 2019) ("To say that criminal investigation and prosecution are suffused with discretion does not imply that *every possible step* must be within the scope of [the discretionary function exception]." (emphasis added)).

Relying on *Macharia v. United States*, Turkey asserts that all decisions about how to protect President Erdogan are susceptible to policy analysis, given that those decisions required its employees to "weigh varying security risk levels against the cost of specific countermeasures." 334 F.3d 61, 66 (D.C. Cir. 2003) (quoting U.S. Dep't of State Foreign Affairs Manual, 12 FAM 314.1). But *Macharia*, which arose from al Qaeda's attack on the U.S. Embassy in Kenya, illustrates a contrary point. There, the government's allegedly negligent

conduct—a failure to provide proper Embassy security—involved archetypical public policy considerations. Decisions like "how much safety equipment should be provided to a particular embassy, how much training should be given to guards and embassy employees, and the amount of security-related guidance that should be provided necessarily entail[] balancing competing demands for funds and resources." *Id.* at 67 (citation omitted).

Although certain Turkish security officers may be responsible for "weigh[ing] varying security risk levels," those are not the decisions giving rise to the plaintiffs' suit. Per *Macharia*, examples of policy tradeoffs that involve weighing security risk levels against the cost of countermeasures might include, for example, how many security officers to deploy and how to train and arm them; how the Turkish security detail used those resources here is not a policy tradeoff. *Cf. Gray v. Bell*, 712 F.2d 490, 508 (D.C. Cir. 1983) (police officers' work does not "typically include" immunized discretionary functions); *Morgan v. Int'l Bank for Reconstruction & Dev.*, 752 F. Supp. 492, 495 (D.D.C. 1990) (discretionary function immunity where "complaint alleges *not a mere scuffle with guards* but a continuous process of investigation into missing money which involved the participation of higher level . . . officials" (emphasis added)).

The Turkish security detail's conduct was grounded in public policy only in the limited way that a police officer effectuates public policy when he gives chase to a fleeing vehicle. It is "universally acknowledged that the discretionary function exception never protects against liability for the negligence of a vehicle driver." *Gaubert*, 499 U.S. at 336 (Scalia, J., concurring). *See also Cope*, 45 F.3d at 448; *MacArthur*, 809 F.2d at 921; *Persinger v. Islamic Republic of Iran*, 729 F.2d 835, 841 n.10 (D.C. Cir. 1984); *Dalehite*, 346

U.S. at 28. For good reason. "Although driving requires the constant exercise of discretion, the official's decisions in exercising that discretion can hardly be said to be grounded in regulatory policy." *Gaubert*, 499 U.S. at 325 n.7. This is true even though a negligent government driver may have been acting in the service of some greater policy. "Viewed from 50,000 feet, virtually any action can be characterized as discretionary. But the discretionary function exception requires that an inquiring court focus on the specific conduct at issue." *Limone v. United States*, 579 F.3d 79, 101 (1st Cir. 2009). When viewed up close, we believe the decisions by the Turkish security detail giving rise to the plaintiffs' suit were not the kind of security-related decisions that are "'fraught with' economic, political, or social judgments." *Cope*, 45 F.3d at 450. The nature of the challenged conduct was not plausibly related to protecting President Erdogan, which is the only authority Turkey had to use force against United States citizens and residents. Our analysis might have been affected if Turkey had consulted with the United States regarding the specific decisions giving rise to the plaintiffs' suit, *see Macharia*, 334 F.3d at 67, but there is no such allegation here and, as noted earlier, the United States has indicted fifteen Turkish security officials as a result of their actions. Turkey's claim to sovereign immunity thereby fails.

Importantly, we do not base our conclusion on whether Turkey's actions were justifiable; that is a merits question, not a jurisdictional one. In the same way that speeding down a residential street may occasionally be justifiable but is not an execution of policy, the Turkish security detail's actions may have been justified in some circumstances but cannot be said in this case to have been plausibly grounded in considerations of security-related policy and thus do not fall within the discretionary function exception.

## III. Political Question Doctrine

The political question doctrine "excludes from judicial review those controversies which revolve around policy choices and value determinations constitutionally committed for resolution to the halls of Congress or the confines of the Executive Branch." *Japan Whaling Ass'n v. Am. Cetacean Soc.*, 478 U.S. 221, 230 (1986). We have called it a "limited and narrow exception to federal court jurisdiction." *Starr Int'l Co. v. United States*, 910 F.3d 527, 533 (D.C. Cir. 2018). A lawsuit presents a non-justiciable political question if it involves one of the following:

> [1] a textually demonstrable constitutional commitment of the issue to a coordinate political department; [2] or a lack of judicially discoverable and manageable standards for resolving it; [3] or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; [4] or the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; [5] or an unusual need for unquestioning adherence to a political decision already made; [6] or the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

*Al-Tamimi v. Adelson*, 916 F.3d 1, 5 (D.C. Cir. 2019) (alterations in original) (quoting *Baker v. Carr*, 369 U.S. 186, 217 (1962)).

Relying primarily on the second factor, Turkey argues that the court lacks judicially discoverable and manageable standards necessary to resolve its immunity claim: "a court cannot decide . . . whether Turkey used a 'degree and nature of

force' that warrants immunity without first determining and then weighing the political justifications for, and reasonableness of, Turkey's security decisions concerning its head of state."

We disagree. As explained, the immunity inquiry turns not on whether Turkey's use of force was reasonable but whether it was the result of political, social or economic policy analysis. We can accept that Turkey has its own justification for responding vigorously to crowds that may endanger its President but nonetheless conclude that the specific attacks on the plaintiffs were "sufficiently separable from protected discretionary decisions." *Moore*, 65 F.3d at 197.

Notwithstanding Turkey's attempted resort to its own foreign relations and antiterrorism policies as a basis for us to find a non-justiciable political question, this case is not about Turkey's foreign relations. Instead, it is about its liability *vel non* for the actions of its own security officers. And that liability, if any, will not impinge on anything but Turkey's fisc.

### IV. International Comity

International comity "is the recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation." *Hilton v. Guyot*, 159 U.S. 113, 164 (1895). Comity can thus be described as a "golden rule among nations—that each must give the respect to the laws, policies and interests of others that it would have others give to its own in the same or similar circumstances." *United States v. One Gulfstream G-V Jet Aircraft*, 941 F. Supp. 2d 1, 8 (D.D.C. 2013) (quoting *Mich. Cmty. Servs., Inc. v. N.L.R.B.*, 309 F.3d 348, 356 (6th Cir. 2002)). According to Turkey, this doctrine prevents a federal court from "second-guessing the difficult decisions that U.S. inaction forced Turkey to make." The district court rejected Turkey's argument, a determination we

review *de novo*, *see Simon v. Republic of Hungary*, 911 F.3d 1172, 1180 (D.C. Cir. 2018), *vacated and remanded*, 141 S. Ct. 691 (2021) (mem.).

In evaluating Turkey's argument, the first task must be to pin down the precise form of the comity doctrine that Turkey purports to invoke. One international law scholar, surveying every Supreme Court case and numerous circuit court cases on international comity, identified three faces of the doctrine in U.S. law: deference to foreign lawmakers ("prescriptive comity"), deference to foreign tribunals ("adjudicative comity"), and deference to foreign litigants ("sovereign party comity"). *See* William S. Dodge, *International Comity in American Law*, 115 Colum. L. Rev. 2071, 2078 (2015). Turkey has not identified any foreign law or foreign judicial decision that pertains to this case. Its claim, then, can only be one of sovereign party comity.

Sovereign party comity acts as both a principle of recognition and a principle of restraint. *See id.* As a principle of recognition, it stands for the proposition that "sovereign states are allowed to sue in the courts of the United States." *Sabbatino*, 376 U.S. at 408–09; *see also Pfizer, Inc. v. Gov't of India*, 434 U.S. 308, 318–19 (1978); *The Sapphire*, 78 U.S. (11 Wall) 164, 167 (1870). As a principle of restraint, it shields foreign states from certain kinds of suits in federal or state court—foreign sovereign immunity, in other words. *See Verlinden B.V. v. Cent. Bank of Nigeria*, 461 U.S. 480, 486 (1983) (immunity is "a matter of grace and comity"); *First Nat'l City Bank v. Banco Nacional de Cuba*, 406 U.S. 759, 765 (1972) (immunity "has its roots . . . in the notion of comity between independent sovereigns"); Dodge, 115 Colum. L. Rev. at 2118. Turkey's competency as a party is not in doubt so its invocation of comity must be construed as an alternative argument for sovereign immunity.

We reach this conclusion not only through the process of exclusion but also by examining Turkey's requested relief. Turkey does not ask us to import a foreign rule of decision—which would invoke prescriptive comity. Nor does it ask us to give a foreign legal decision *res judicata* effect—which would invoke adjudicative comity. Rather, it asks us to "abstain from hearing" the suit altogether. Thus, although Turkey denominates its third argument as one of comity, it is in effect asserting an alternative basis for sovereign immunity.

In support of its argument, Turkey emphasizes the obvious challenges of protecting a head of state in a foreign country. The question before us, however, is not whether there are good policy reasons to grant latitude to foreign security services but whether those reasons require dismissal of a case of which the FSIA grants the district court jurisdiction.

In the FSIA, the Congress enacted a "comprehensive framework for resolving any claim of sovereign immunity." *Republic of Austria v. Altmann*, 541 U.S. 677, 699 (2004). The purpose of the FSIA was "to free the Government from . . . case-by-case diplomatic pressures." *Verlinden*, 461 U.S. at 488. The statute effectuates this purpose by "set[ting] forth 'the *sole* and *exclusive* standards to be used in resolving questions of sovereign immunity raised by foreign states before Federal and State courts in the United States.'" *MacArthur*, 809 F.2d at 919 (emphasis added) (quoting H.R. Rep. 94-1487, at 12.). We thus have no authority to override the FSIA's express exception for tortious conduct based on the sort of "ambiguous and politically charged standards that the FSIA replaced." *Altmann*, 541 U.S. at 699 (internal quotations omitted).

For the foregoing reasons, we conclude that the district court properly asserted jurisdiction of the plaintiffs' two lawsuits and affirm its denial of Turkey's motions to dismiss.

*So ordered.*